MUNGER, TOLLES & OLSON LLP

RONALD L. OLSON
ROBERT E. DENHAM
CARY B. LERMAN
GREGORY P. STONE
BRAD D. BRIAN
GEORGE M. GARVEY
WILLIAM D. TEMKO
JOHN W. SPIEGEL
DONALD B. VERRILLI, JR. P.C.*
STEVEN M. PERRY
JOSEPH D. LEE
MICHAEL R. DOYEN
MICHAEL E. SOLOFF
KATHLEEN M. M'DOWELL
GLENN D. POMERANTZ
THOMAS B. WALPER
HENRY WEISSMANN
KEVIN S. ALLRED
JEFFREY A. HEINTZ
JUDITH T. KITANO
STUART N. SENATOR
MARTIN D. BERN
JONATHAN E. ALTMAN
KELLY M. KLAUS
DAVID B. GOLDMAN
DAVID H. FRY
LISA J. DEMSKY
MALCOLM A. HEINICKE
JAMES C. RUTTEN
RICHARD ST. JOHN
ROHIT K. SINGLA
CAROLYN HOECKER LUEDTKE
C. DAVID LEE
BRETT J. RODDA P.C.*
KATHERINE M. FORSTER
BLANCA FROMM YOUNG
SETH GOLDMAN
GRANT A. DAVIS-DENNY
JONATHAN H. BLAVIN
DANIEL B. LEVIN
MIRIAM KIM
HAILYN J. CHEN
BETHANY W. KRISTOVICH
JACOB S. KREILKAMP
JEFFREY Y. WU
LAURA D. SMOLOWE
KYLE W. MACH
HEATHER E. TAKAHASHI
ERIN J. COX
BENJAMIN J. HORWICH
BRYAN H. HECKENLIVELY
ELAINE J. GOLDENBERG P.C.*

GINGER D. ANDERS P.C.*
MARGARET G. MARASCHINO
ADAM B. WEISS
KELLY L. C. KRIEBS
JEREMY A. LAWRENCE
ACHYUT J. PHADKE
ZACHARY M. BRIERS
JENNIFER M. BRODER
KURUVILLA J. OLASA
JUSTIN P. RAPHAEL
ROSE LEDA EHLER
JOHN W. BERRY
ROBYN K. BACON
JORDAN D. SEGALL
JONATHAN KRAVIS P.C.*
JOHN L. SCHWAB
EMILY C. CURRAN-HUBERTY
MATTHEW S. SCHONHOLZ
L. ASHLEY AULL
WESLEY T.L. BURRELL
CRAIG JENNINGS LAVOIE
JENNIFER L. BRYANT
NICHOLAS D. FRAM
TYLER HILTON
VINCENT LING
LAUREN BELL P.C.
VICTORIA A. DEGTYAREVA
JOHN B. MAJOR
RACHEL G. MILLER-ZIEGLER P.C.*
FAYE PAUL TELLER
JULIANA M. YEE
LAUREN C. BARNETT
NICK R. SIDNEY
SKYLAR B. GROVE
LAURA M. LOPEZ
COLIN A. DEVINE
DANE P. SHIKMAN
MAGGIE THOMPSON
ALLISON M. DAY
GIOVANNI S. SAARMAN GONZÁLEZ
STEPHANIE G. HERRERA
SARA A. MCDERMOTT
J. MAX ROSEN
ANNE K. CONLEY
DAVID W. MORESHEAD
ANDRE W. BREWSTER III
ROWLEY J. RICE
DAHLIA MIGNOUNA*
USHA CHILUKURI VANCE
ZARA BARI

BRENDAN B. GANTS*
LAUREN E. ROSS*
BENJAMIN G. BAROKH
ABE DYK
MICHELE C. NIELSEN
MEGAN MCCREADIE
RAQUEL E. DOMINGUEZ
ARIEL TESHUVA
SHANNON GALVIN AMINIRAD
XIAONAN APRIL HU*
NATALIE KARL
ERINMA E. MAN
CARRIE C. LITTEN
RUBY J. GARRETT*
JAMES R. SALZMANN
SAMIR HALAWI
ROBIN GRAY SCHWEITZER
JOSEPH MOSES
MICHAEL I. SELVIN
HUNTER V. ARMOUR
NATHANIEL F. SUSSMAN
OLIVER BROWN
PAUL E. MARTIN
REBECCA L. SCIARRINO
CORY M. BATZA
BRIAN R. BOESSENECKER
AVI REJWAN OVED
ROBERT E. BOWEN
NICHOLAS T JOHNSON
GRACE DAVIS FISHER
LAUREN N. BECK
CALEB W. PEIFFER
GREGORY T. S. BISCHOPING*
JAMIE B. LUGURI
STEVEN B. R. LEVICK
JANELLE KRUMMEN
WILLIAM M. ORR
GABRIEL M. BRONSHTEYN
JING JIN
ALEX C. WERNER
ROSIO FLORES
JESSICA O. LAIRD
ERICA C. TOOCH
SARAH E. WEINER*
LEONARDO MANGAT*
EVAN MANN
ANDREW T. NGUYEN
RACHEL M. SCHIFF
MARINA E. RENAUT
TIANA S. BAHERI
STEPHANY REAVES*

LAUREN E. KUHN
J. KAIN DAY
MINKEE K. SOHN
GARRETT SOLBERG
TED KANG
LEIGH E. KRAMER
ADAM W. KWON
H. JAVIER KORDI
JOSEPH N. GLYNN
SIMON K. ZHEN
CARSON J. SCOTT
AVERY P. HITCHCOCK
ELISSA WALTER
MADELYN Y. CHEN
CHRISTOPHER B. CRUZ
JARED T. KOCH
JERRY YAN
BRIANNE HOLLAND-STERGAR
NICHOLAS NEUTEUFEL
JIMMY BIBLARZ
ADEEL MOHAMMADI
TAYLOR L. BENNINGER
CLARE KANE
SIDNEY MOSKOWITZ
HELEN ELIZABETH WHITE*

OF COUNSEL

ROBERT K. JOHNSON
PATRICK J. CAFFERTY, JR.
PETER A. DETRE
BRADLEY R. SCHNEIDER
PETER E. GRATZINGER
JENNY H. HONG
KIMBERLY A. CHI
ADAM R. LAWTON
MICHAEL E. GREANEY
SARAH J. COLE

E. LEROY TOLLES
(1922-2008)

*ADMITTED IN DC.
ALL OTHERS ADMITTED IN CA

350 SOUTH GRAND AVENUE
FIFTIETH FLOOR
LOS ANGELES, CALIFORNIA 90071-3426
TELEPHONE (213) 683-9100
FACSIMILE (213) 687-3702

—————

560 MISSION STREET
TWENTY-SEVENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-3089
TELEPHONE (415) 512-4000
FACSIMILE (415) 512-4077

—————

601 MASSACHUSETTS AVENUE NW
SUITE 500E
WASHINGTON, D.C. 20001-5369
TELEPHONE (202) 220-1100
FACSIMILE (202) 220-2300

June 8, 2023

Writer's Direct Contact
(213) 683-9502
(213) 683-9502 FAX
Ashley.Aull@mto.com

Molly Dwyer
Clerk of the Court
Ninth Circuit Court of Appeals
95 Seventh Street
San Francisco, California 94103

**VIA CM/ECF**

Re:     *Equal Employment Opportunity Commission v. Activision Blizzard, Inc. et al.*
(Proposed Intervenor-Appellant California Department of Fair Employment and Housing), CA. Nos. 22-55060, 22-55587

Calendared—June 13, 2023 (Pasadena)—Bybee, Christen, Vitaliano

Dear Ms. Dwyer:

Pursuant to Rule 28(j) and the Court's June 2, 2023 order, Defendants-Appellees respectfully submit the following supplemental authority.

An appeal must be dismissed "if an event occurs while a case is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party[.]" *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992). Specifically, the "particular circumstances" of a settlement—or the execution of a settlement— can moot an appeal. *United States v. Sprint Commc'ns, Inc.*, 855 F.3d 985, 990 (9th Cir. 2017); *W. Coast Seafood Processors Ass'n v. NRDC*, 643 F.3d 701, 704 (9th Cir. 2011).

MUNGER, TOLLES & OLSON LLP

CA Nos. 22-55060, 22-55587
June 8, 2023
Page 2

        Defendants understand, from the EEOC, that the Consent Decree's claims-administration process is complete in all material respects. (*See* 1-ER-15–25.) The claims-submission period closed in August 2022; since then, the EEOC has completed its assessment and allocation of all submitted claims. (EEOC-AB[1] at 26.) That is: The EEOC has already received and considered claim forms and other information from potential claimants—collection of information that DFEH challenged. (OB-I at 15 ¶ b.) The Claims Administrator has sent all the "release" forms that DFEH challenged. (*Id.* ¶ a.) For any eligible claimant who chose to accept compensation through this process—after the opportunity to consult with counsel—the "release" has been signed and money has been paid. The EEOC is not a party to those contracts. (1-ER-58.) The contracts include no provision allowing for rescission based on post-hoc changes to the Consent Decree's process—much less the claw-back of funds. (1-ER-78–80.)

        Under analogous circumstances, the Eleventh Circuit dismissed an appeal from the denial of a proposed settlement agreement as moot, where specific deadlines set forth in that agreement had passed. *Brooks v. Georgia State Bd. of Elections*, 59 F.3d 1114, 1119 (11th Cir. 1995). The Court could "not grant effective or meaningful relief" because the parties "could not possibly comply with the key requirements of the settlement." *Id.* Here, even assuming DFEH could intervene and convince the Court to eliminate specific Consent Decree provisions DFEH challenged, those revisions would have no effect.

        Respectfully submitted,

*[signature]*

L. Ashley Aull

Attorney for Defendants-Appellees Activision Blizzard, Inc., Blizzard Entertainment, Inc., Activision Publishing, Inc., and King.com, Inc.

---

[1] "EEOC-AB" refers to Plaintiff-Appellee Equal Employment Opportunity Commission's Answering Brief. (Docket No. 58.) "OB-I" refers to Proposed Intervenor-Appellant's Opening Brief in Case No. 22-55060. (Docket No. 19.)

*Brooks v. Georgia State Bd. of Elections*,
59 F.3d 1114 (11th Cir. 1995)

59 F.3d 1114
United States Court of Appeals,
Eleventh Circuit.

Tyrone BROOKS, Lanette Stanley, Billy McKinney,
Joe Beasley, Venus E. Holmes, Michael Robinson,
Edward Brown, John White, Mary Young–Cummings,
Mary Black, Willie Mays, William Young, Deanie
Frazier, G.L. Avery, Rev., Rev. Dr. William
Howell, Plaintiffs–Counter–Defendants–Appellants,
Donale E. Cheeks, Emil Klingenfus, Inez
Wylds, Richard Dyson, Vince Robertson,
Intervenors–Plaintiffs, Cross–Claimants,
v.
GEORGIA STATE BOARD OF ELECTIONS,
Max Cleland, Secretary of State and Chairman
of the Georgia State Board of Elections,
Defendants–Cross–Defendants, Appellees.

No. 94–8398.
|
July 17, 1995.

**Synopsis**
Parties to suit challenging Georgia's system of electing
judges under Voting Rights Act and Federal Constitution
jointly moved for approval of proposed settlement agreement.
The United States District Court for the Southern District
of Georgia, No. CV288–146, B. Avant Edenfeld, Chief
Judge, rejected proposed settlement, 848 F.Supp. 1548, and
appeal was taken. The Court of Appeals, Dubina, Circuit
Judge, held that: (1) appeal from order denying approval of
proposed settlement agreement was moot, and (2) "capable
of repetition, yet evading review" exception to mootness
doctrine did not apply.

Appeal dismissed; remanded.

**Attorneys and Law Firms**

**\*1116** Laughlin McDonald, Neil Bradley, Mary Wyckoff,
ACLU, Atlanta, GA, for appellants.

David Frank Walbert, Walbert & Herman, Atlanta, GA, for
appellees.

Carol Atha Cosgrove, Atlanta, GA, for Ga. State Bd. and Max
Cleland.

Charles L. Wilkinson, III, Stanley C. House, Augusta, GA,
for Donald Cheeks, et al.

Randal Mangham, Randal A. Mangham, P.C., Atlanta, GA,
for other interested parties.

Appeal from the United States District Court for the Southern
District of Georgia.

Before DUBINA, Circuit Judge, RONEY and
ESCHBACH, [*] Senior Circuit Judges.

**Opinion**

DUBINA, Circuit Judge:

Plaintiffs/Appellants, a group of black registered voters in the
State of Georgia ("Plaintiffs"), appeal the district court's order
denying their motion for approval of a proposed settlement
agreement with Defendants/Appellees, the Georgia State
Board of Elections *et al.* ("Defendants" or "the state"), in
this action under Section 2 of the Voting Rights Act of
1965, 42 U.S.C. § 1973c (1988). The settlement agreement is
opposed by certain intervenors who argue that the terms of the
agreement violate their state and federal constitutional rights.
Because we conclude that we cannot give any meaningful
relief in this case, we dismiss this appeal as moot and remand
the case to the district court for further proceedings.

I.

Plaintiffs brought this action against the Defendant state
agencies and officers in 1988, alleging that the method of
electing judges of the state court, superior court, and court of
appeals and justices of the supreme court in Georgia [1] violates
Section 2 of the Voting Rights Act ("VRA") and the United
States Constitution. Plaintiffs also claimed that superior court
judgeships and circuit **\*1117** configurations that had been
enacted by the Georgia legislature prior to November 1, 1964,
required federal approval pursuant to Section 5 of the VRA.

Pursuant to Section 5, a three-judge panel ("the Panel") was
convened. In December 1989, the Panel held that Section
5 applied to judicial elections, that the Georgia electoral
scheme has the potential for discriminating against minority
voters, and that the State of Georgia failed to obtain the
required preclearance for numerous changes to their electoral
system. *Brooks v. State Bd. of Elections,* 775 F.Supp. 1470,

1484 (S.D.Ga.1989), *aff'd*, 498 U.S. 916, 111 S.Ct. 288, 112 L.Ed.2d 243 (1990). Consequently, the Panel enjoined further elections or appointments to judicial positions that had not been precleared, but allowed incumbents to serve out their terms. *Id.* at 1484. [2]

On June 17, 1992, Plaintiffs and Defendants reached a proposed settlement agreement. The agreement, presented to the district court in the form of a consent decree, provided, *inter alia,* that:

> (1) the Governor will hereafter appoint all judges in Georgia; (2) appointed judges will thereafter be subject only to retention elections; (3) by the end of 1994 there will be at least twenty-five black superior court judges and five additional blacks will be appointed to either the state court or the superior court; (4) in order to realize these numerical requirements, a new category of judgeships, "State Assignment Superior Court Judgeships" may be created and filled by black candidates to serve by assignment in any of the state's judicial circuits; and (5) any disputes that arise under this system in the future will be overseen by Senior District Judge Anthony A. Alaimo.

*Brooks v. State Bd. of Elections,* 848 F.Supp. 1548, 1551 (S.D.Ga.1994) (citing Consent Decree at 10–14). [3]

On August 30, 1993, the Attorney General of the United States ("Attorney General") approved the proposed settlement, preclearing the changes to the Georgia system of judicial elections provided for in the settlement agreement. The Attorney General's approval was conditioned upon approval of the agreement by the district court and based on assurances by the Georgia Attorney General that the terms of the plan do not violate the Georgia Constitution. The Attorney General expressed concern, however, that certain provisions of the plan may be contrary to the United States Supreme Court's decision in *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).

In November of 1993, the Panel denied a motion to allow interim gubernatorial appointments to certain judicial posts pending a final decision by the district court on the proposed settlement agreement. Importantly, the Panel also severed the Section 5 and Section 2 portions of the case, retaining control over the Section 5 claims and directing that the Section 2 claims be addressed by the district court. [4]

On November 22, 1993, the district court certified a Plaintiff class consisting of all present and future black registered voters in Georgia, ordering that notice be given to absent class members pursuant to Fed.R.Civ.P. 23(e). On January 12, 1994, the court held a fairness hearing, at which the court heard evidence and argument from the Plaintiff class representatives, the Defendants, the intervenors, and several objectors.

Finally, on March 7, 1994, the district court entered an order denying the joint motion of Plaintiffs and Defendants seeking **\*1118** approval of the settlement agreement. The court first noted that there had been no determination to date, and no admission by Defendants, that the current Georgia judicial election system violates Section 2 or the federal Constitution. The court reasoned that absent such a finding, it would be inappropriate to force a change upon Georgia's citizens that would reduce their rights to elect public officials of their choice. *Brooks,* 848 F.Supp. at 1577. Furthermore, the court determined that certain provisions of the settlement would violate Georgia law. Most notably, the court found that a retention election system would not satisfy the Georgia constitutional requirement that judges be elected. *Id.* Moreover, the court held that some provisions of the settlement would violate the Equal Protection Clause of the Fourteenth Amendment, finding that the provisions requiring the appointment of thirty black judges by December 31, 1994, and establishing state assignment superior court judgeships were race-conscious measures that were not narrowly tailored to achieve a compelling state interest. *Id.* In sum, the court concluded that the settlement agreement was not "fair, adequate, reasonable and legal" under the "totality of [the] circumstances." *Id.* at 1578. Plaintiffs then perfected this appeal pursuant to 28 U.S.C. § 1292(a)(1). [5]

## II.

We first must address the threshold jurisdictional question of whether this appeal is moot. Defendants suggest in their

brief that the issues raised by Plaintiffs "may be moot." Appellee's Brief at 21. In response, Plaintiffs emphasize that "[t]he state has not argued that the case is in fact moot." Appellants' Reply Brief at 2. Regardless of whether the state has argued mootness, however, "[i]t is incumbent upon this court to consider issues of mootness *sua sponte* and, absent an applicable exception to the mootness doctrine, to dismiss any appeal that no longer presents a viable case or controversy." *Pacific Ins. Co. v. General Development Corp.,* 28 F.3d 1093, 1096 (11th Cir.1994).

Defendants point out that the proposed settlement agreement requires the state to add approximately twenty black superior court and/or state court judges to the bench by December 31, 1994, bringing the total number of black trial judges to thirty. Subsequent to January 1, 1995, the Governor of the State of Georgia is to make judicial appointments without regard to race, color, or ethnic origin. Obviously, because the deadline for the appointment of these black judges has passed, it is impossible for the state to comply with the "thirty-black-judge-minimum" requirement. Moreover, any race-conscious appointments made at this late date would directly contravene the provision in the agreement requiring that appointments made subsequent to January 1, 1995, be "colorblind." Thus, even if we were to reverse the district court's order rejecting the settlement agreement, the agreement could not be implemented under its present terms.

Under Article III of the United States Constitution, federal courts may adjudicate only actual, ongoing cases or controversies. U.S. Const. art. III; *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477, 110 S.Ct. 1249, 1253, 108 L.Ed.2d 400 (1990). "It has long been settled that a federal court has no authority 'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.' " *Church of Scientology of California v. United States,* 506 U.S. 9, ——, 113 S.Ct. 447, 449, 121 L.Ed.2d 313 (1992) (quoting *Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895)). "For that reason, if an event occurs while a case is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party, the appeal must be dismissed." *Id.; see also* **\*1119** *Ethredge v. Hail,* 996 F.2d 1173, 1175 (11th Cir.1993). An appellate court simply does not have jurisdiction under Article III "to decide questions which have become moot by reason of intervening events." *C & C Products, Inc. v. Messick,* 700 F.2d 635, 636 (11th Cir.1983); *United States v. Florida Azalea Specialists,* 19 F.3d 620, 622 (11th Cir.1994).

Research reveals no case law on mootness presenting the exact situation in the present appeal; that is, an appeal from a district court's rejection of a settlement agreement with specific deadlines that have expired. In an analogous situation, however, this court has consistently held that the appeal of a preliminary injunction is moot where the effective time period of the injunction has passed. For example, in *Tropicana Products Sales, Inc. v. Phillips Brokerage Co.,* 874 F.2d 1581 (11th Cir.1989), the plaintiff appealed from the district court's denial of a motion for a preliminary injunction that was to expire on February 13, 1989. The appeal was argued on March 21, 1989, several weeks after the end-date of the requested injunction. *Id.* at 1582. Because the effective dates of the preliminary injunction had expired, the court concluded that it could not grant effective relief and dismissed the appeal as moot. *Id.* at 1583. The court reasoned that "[t]he express limitation Tropicana's motion set for itself has divested this Court of jurisdiction over the appeal." *Id. See also Pacific Ins. Co.,* 28 F.3d at 1096 (holding that "no meaningful relief remains for us to provide" because "the injunction we are asked to review has expired by its own terms").

Similarly, because of intervening events, we could not grant effective or meaningful relief in the present case. The only issue before us on this appeal is the propriety of the district court's rejection of the proposed settlement agreement. As noted above, some of the deadlines in the agreement have already passed, making the settlement impossible to implement under its present terms. Consequently, it appears that a decision by this court reversing the district court's determination and ordering implementation of the settlement agreement would not provide meaningful relief, since the state could not possibly comply with the key requirements of the settlement. Thus, any opinion we would render on the merits would be purely advisory.

At oral argument, Plaintiffs' counsel suggested that we could save this appeal from mootness by approving the settlement agreement "now for then," with either this court or the district court on remand modifying the dates in the agreement so that the state could comply with its terms. We disagree. First, we reiterate that the Article III "case or controversy" requirement mandates that the case be viable at all stages of the litigation; "it is not sufficient that the controversy was live only at its inception." *C & C Products, Inc.,* 700 F.2d at 636.

Second, we have found no authority for the proposition that a federal court may modify the terms of a voluntary settlement agreement between parties before a decree has been entered. In *Evans v. Jeff D.,* 475 U.S. 717, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986), the Supreme Court explained the role of the district court in reviewing settlements in class actions:

> Rule 23(e) wisely requires court approval of the terms of any settlement of a class action, but the power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed. Although changed circumstances may justify a court-ordered modification of a consent decree over the objections of a party after the decree has been entered, ... Rule 23(e) does not give the court the power ... to modify a proposed consent decree and order its acceptance over either party's objection.

*Id.* at 726–27, 106 S.Ct. at 1537 (footnotes omitted). Similarly, the duty of an appellate court is simply to ascertain whether or not the trial judge clearly abused his discretion in approving or rejecting a settlement agreement. *Cotton v. Hinton,* 559 F.2d 1326, 1333 (5th Cir.1977).[6] "We are not free to delete, **\*1120** modify or substitute certain provisions of the settlement. The settlement must stand or fall as a whole." *Id.* at 1331–32. *Accord Jeff D. v. Andrus,* 899 F.2d 753, 758 (9th Cir.1989) ( "[C]ourts are not permitted to modify settlement terms or in any manner to rewrite agreements reached by parties."); *In re Warner Communications Securities Litigation,* 798 F.2d 35, 37 (2d Cir.1986) ("[I]t is not a district judge's job to dictate the terms of a class settlement; he should approve or disapprove a proposed agreement as it is placed before him and should not take it upon himself to modify its terms.").

In light of this clear precedent, we are convinced that neither this court nor the district court has the power to modify the effective dates in the proposed settlement agreement in order to afford meaningful relief and escape the jurisdictional bar of mootness. *See Gilpin v. American Fed'n of State, County,*

*and Mun. Employees, AFL–CIO,* 875 F.2d 1310, 1313 (7th Cir.) ("Even the United States Court of Appeals ... cannot make time run backwards."), *cert. denied,* 493 U.S. 917, 110 S.Ct. 278, 107 L.Ed.2d 258 (1989). Moreover, even if we had the power to modify the dates in the agreement as Plaintiffs suggest, we conclude that it would be inappropriate to impose a settlement that has expired by its own terms on parties no longer in agreement on the propriety of the settlement. *Cf. Thibaut v. Ourso,* 705 F.2d 118, 121 (5th Cir.1983) (dismissing appeal as moot and stating that plaintiff "cannot ask this Court to reconstruct a legal and financial puzzle which is now missing several pieces"). We have no way of reading the minds of the parties to ascertain their evaluation of the circumstances under which they settled or the importance of the discrete terms of the agreement, including the date-specific provisions involved in the proposed settlement. Thus, we decline Plaintiffs' invitation to modify the terms of the agreement to save this appeal from mootness. Accordingly, because we cannot afford meaningful relief in this case, we conclude that this appeal must be dismissed as moot unless it falls within a specific exception to the mootness rule.

There are several well-established exceptions to the mootness doctrine. First, a case is not moot where the issue raised is "capable of repetition, yet evading review." *See, e.g., Naturist Soc'y, Inc. v. Fillyaw,* 958 F.2d 1515, 1520 (11th Cir.1992) (citations omitted). This exception allows a court to reach the merits of a case which is otherwise moot if (1) there is a " 'reasonable expectation' or a 'demonstrated probability' that the same controversy will recur involving the same complaining party," and (2) the "challenged action was in its duration too short to be fully litigated prior to its cessation or expiration." *The News–Journal Corp. v. Foxman,* 939 F.2d 1499, 1507 (11th Cir.1991) (quoting *Murphy v. Hunt,* 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) (per curiam)). Thus, "[a] controversy is not capable of repetition if there is only 'a mere physical or theoretical possibility' of recurrence." *C & C Products,* 700 F.2d at 637 (citations omitted).

This exception is inapplicable in the present case. The issues in this case are *theoretically* capable of repetition, in that the parties could propose a new settlement agreement with similar terms of questionable constitutional validity. In light of the changed circumstances (including the declaratory judgment in favor of the state in the Section 5 action), however, we deem it extremely unlikely that the state will settle the Section 2 action again and cause an identical dispute over the validity of a settlement agreement.[7] Consequently, this

case does not manifest "a demonstrated probability that the same controversy will recur, involving the same complaining party." *Murphy,* 455 U.S. at 482, 102 S.Ct. at 1183.

In addition, we are not persuaded that the issues in this case "evade review." First, we note that the issues in this appeal evade **\*1121** review only because of date-specific provisions set voluntarily by the parties. Thus, while it is true that this particular appeal was mooted before the issues raised could be addressed, it does not follow "that similar future cases will evade review." *Neighborhood Transp. Network, Inc. v. Pena,* 42 F.3d 1169, 1173 (8th Cir.1994). A dismissal of this appeal as moot would not preclude the parties from proposing a new settlement agreement with different terms and litigating the issue of its validity in a subsequent appeal. There is no reason to expect that any subsequent agreement by the parties would necessarily include stringent time limitations likely to expire before an appeal could be heard. Accordingly, "we do not believe this type of claim is inherently of such short duration that it consistently will evade future appellate consideration." *Pacific Ins. Co.,* 28 F.3d at 1097. Furthermore, the district court retained jurisdiction of the case, which may be litigated on the merits and the outcome appealed should the parties choose to take that route. *See Tropicana,* 874 F.2d at 1583 (holding that the case did not "evade review" where the trial court still had the opportunity to address the merits of the case). For these reasons, we conclude that the rare exception for issues "capable of repetition, yet evading review" is inapplicable in the present case.

Another exception to mootness applies where "an appellant has taken all steps necessary to perfect the appeal and to preserve the status quo before the dispute becomes moot." *B & B Chemical Co. v. EPA,* 806 F.2d 987, 990 (11th Cir.1986). "This exception, however, is an extremely narrow one that has been limited primarily to criminal defendants who seek to challenge their convictions notwithstanding that they have been released from custody." *Ethredge,* 996 F.2d at 1176–77 (footnote omitted). Therefore, the "all necessary steps" exception does not save the appeal in this case from dismissal for mootness.

A third exception to the doctrine of mootness allows review of an otherwise-moot case if the district court's order will have dangerous collateral consequences if not reversed. *See, e.g., B & B Chemical Co.,* 806 F.2d at 990. There is no such danger in the present case, however, as the district court's order is limited to the specific terms of the settlement agreement.

Thus, no collateral consequences are present to warrant an exception to mootness in this case.

In summary, Plaintiffs have not articulated a persuasive argument against dismissing this appeal as moot. Alternatively, they contend that "[w]hether or not the settlement agreement could be implemented in the event of a reversal by this Court is essentially a factual determination which could best be determined in the first instance by the district court." Appellants' Reply Brief at 2. Thus, Plaintiffs propose that, in the event of a reversal, this court should "remand for implementation of the agreement, or with directions for the district court to withhold approval of the agreement in the event it found the settlement to be moot after the parties have the opportunity to develop a current record going to that issue." *Id.*

We reject this argument. First, mootness is a threshold jurisdictional inquiry. As discussed above, "Article III denies federal courts the power 'to decide questions that cannot affect the rights of the litigants in the case before them.'" *Lewis,* 494 U.S. at 477, 110 S.Ct. at 1253 (quoting *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971)). It would be clearly improper for us to ignore the obvious mootness issue in this case, decide the merits of the appeal, and then remand to the district court for an after-the-fact determination of whether a case or controversy exists to give us jurisdiction. In addition, we believe it unnecessary to remand to the district court for a "factual determination" of whether the settlement agreement could be implemented, as it is apparent from the dates in the agreement that the state cannot possibly comply with its terms. Therefore, we reject Plaintiffs' suggestion that we remand to the district court to determine the mootness issue. Instead, based on the expired terms of the proposed agreement at issue, we conclude that we cannot afford meaningful relief in this case, that no exception to the mootness doctrine applies, and that this appeal is therefore moot and ought to be dismissed.

**\*1122** III.

As a general rule, "[w]hen a case becomes moot after the district court enters its judgment but before this court has issued a decision, we are divested of jurisdiction and must dismiss the appeal and vacate the underlying judgment." *Ethredge,* 996 F.2d at 1175 (citations omitted). In the case of interlocutory appeals, however, "the usual practice is just

to dismiss the appeal as moot and not vacate the order appealed from." *In re Tax Refund Litigation,* 915 F.2d 58, 59 (2d Cir.1990) (citations omitted); *see also* 13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3533.10, at 435–36 (2d ed. 1984). We have followed this practice and dismissed moot appeals without vacating the underlying district court order in cases involving appeals from preliminary injunctions and interlocutory orders. *See, e.g., Pacific Ins. Co.,* 28 F.3d at 1097; *Tropicana,* 874 F.2d at 1584; *C & C Products,* 700 F.2d at 638. Accordingly, we dismiss the appeal as moot, but we do not vacate the district court's order.

We emphasize that our dismissal of this appeal as moot is necessarily limited to the specific order before us: the district court's rejection of the proposed settlement agreement. *See Ethredge,* 996 F.2d at 1175. Still pending before the district court is the broader issue of the merits of Plaintiffs' Section 2 claim.

For all of the foregoing reasons, Plaintiffs' appeal is DISMISSED, and the case is REMANDED to the district court for further proceedings consistent with this opinion.

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF GEORGIA BRUNSWICK DIVISION

Tyrone Brooks, et al., Plaintiffs,

v.

State Board of Elections, et al., Defendants.

Civil Action File No. CV288–146

*CONSENT DECREE*

This matter comes before the Court for judicial approval of a settlement entered into between the parties in the above captioned case.

A. *Introduction*

*Brooks v. Georgia State Board of Elections,* Civ. No. CV288–146 (S.D.Ga.) (hereinafter "*Brooks* I") was filed on July 13, 1988, alleging violations of Sections 2 and 5 of the Voting Rights Act, 42 U.S.C. § 1971, *et seq.,* as well as the First, Thirteenth, Fourteenth and Fifteenth Amendments of the Constitution of the United States, in the manner in which the State of Georgia elects its superior court judges.

*Brooks v. Miller,* Civ. No. 1:90–CV–1001–RCF (N.D.Ga.) (hereinafter "*Brooks* II"), was filed on May 8, 1990, alleging that the use of a majority vote requirement for federal, state, and county elections in Georgia, O.C.G.A. § 21–2–501, was in violation of Section 2 and the First, Thirteenth, Fourteenth and Fifteenth Amendments of the Constitution of the United States.

The courts have jurisdiction of the above described actions pursuant to 42 U.S.C. §§ 1971(d), 1973j(f) and 28 U.S.C. §§ 1331, 1343, 2201 and 2202.

B. *Parties*

1. *Brooks I*

The plaintiffs in *Brooks I* are twenty-two (22) black citizens and voters from throughout the State of Georgia. They allege that the use of at-large, numbered post elections for superior court judges, using a majority vote requirement, violates both Sections 2 and 5 of the Voting Rights Act. They also challenge the manner in which certain judicial circuits are drawn. Further, they allege that the State of Georgia has illegally implemented numerous statutes creating additional superior court judgeships, without first obtaining preclearance from the United States Department of Justice or the United States District Court for the District of Columbia. Since the filing of the complaint, plaintiffs have broadened their challenge to include the statewide method of electing appellate court judges, *i.e.,* the judges of the court of appeals and supreme court, and the **\*1123** at-large method of electing state court judges.

Defendants are the Secretary of State and the Georgia Board of Elections, who are charged with the responsibility for supervising the conduct of elections for judges of the superior court in the various circuits throughout the state.

2. *Brooks II*

The plaintiffs in *Brooks II* are twenty-seven (27) black citizens and voters throughout Georgia, and include the

plaintiffs in *Brooks I.* They allege that the statewide majority vote requirement was adopted in 1964 with a racially discriminatory purpose, and that it has a discriminatory result in violation of Section 2 and the Constitution.

Defendants are the Governor, the Georgia Board of Elections, the Secretary of State, and the Constitutional Officers Election Board, who have the duty of administering and implementing the statewide majority vote requirement, and the DeKalb County, Georgia Board of Elections, and the Superintendent of Elections of DeKalb County, who were sued on their own behalf and as representatives of a class consisting of other boards and entities in Georgia which administer and implement the statewide majority vote requirement in their respective counties.

C. *Course of Relevant Proceedings to Date*

1. *Brooks I*

Between 1964 and 1988, Georgia enacted 80 statutes regarding the election of superior court judges. All told, seventy-seven judgeships and five new circuits were created. The judgeships and new circuits were implemented by the state shortly after enactment.

On June 27, 1988 the State submitted these statutes to the Attorney General for preclearance. By letter of August 26, 1988 the Attorney General notified the State he did not object to thirty-one of the proposed changes, and requested additional information regarding the remaining changes. The State elected instead to litigate the question of Section 5 coverage in the *Brooks I* court rather than complete the administrative submission. Because that submission was not completed, the Attorney General objected to the remaining pending statutes on June 16, 1989, at which time none of the additional requested information had been submitted.

On May 16, 1989, plaintiffs filed a motion for preliminary injunction, seeking to enjoin any further implementation of these unprecleared statutes. By order of December 1, 1989, the court gave defendants thirty (30) days within which to submit the information requested by the Attorney General and ordered that no further appointments or elections could be made as to 48 judgeships until preclearance was obtained. *Brooks v. Georgia State Board of Elections,* 775 F.Supp. 1470, 1482–83 (S.D.Ga.1989).

The State of Georgia provided the requested information to the Attorney General within the time frame set by the court.

On April 25, 1990, the Attorney General entered an objection on the merits to all 48 judgeships, finding that the state had not carried its burden of proving that the changes had neither a discriminatory purpose nor discriminatory effect. A copy of that objection letter is a part of the stipulated evidence in the record in these cases.

By order of May 29, 1990, as amended on June 25, 1990, the court provided that incumbent judges could continue to hold office until the preclearance question was finally resolved in the United States District Court for the District of Columbia, but continued the bar against appointment or election as to those judgeships which had not yet been precleared. The orders of the court finding that the disputed voting practices were covered by Section 5, and implementing a remedy, were affirmed by the Supreme Court. *Brooks v. Georgia State Board of Elections,* 498 U.S. 916, 111 S.Ct. 288, 112 L.Ed.2d 243 (1990), and *Georgia State Board of Elections v. Brooks,* 498 U.S. 916, 111 S.Ct. 288, 112 L.Ed.2d 243 (1990). Although a declaratory judgment action was filed by the state in the U.S. District Court for the District of Columbia, *Georgia v. Barr,* C.A. No. 90–2065 (D.D.C.), no preclearance has been obtained as of this date as to a total of 62 judgeships.

**\*1124** No proceedings have yet been held as to plaintiffs' claims under Section 2 of the Voting Rights Act.

2. *Brooks II*

The statewide majority vote requirement provides in relevant part that "no candidate shall be nominated for public office in any primary or elected to public office in any election unless such candidate shall have received a majority of the votes cast to fill such nomination or public office." O.C.G.A. § 21–2–501. The statute applies to all federal, state, and county elections, except the general election for Governor, in which a majority vote requirement is separately provided for by Ga.Laws 1968, pp. 977 and 1562. A majority vote requirement is also in effect for municipal elections by virtue of Ga.Laws 1968, p. 885, O.C.G.A. § 21–3–407, except for those municipalities whose charters provide otherwise. The plaintiffs in *Brooks II* did not challenge the majority vote requirement for municipal elections, nor did they challenge the use of a majority vote requirement pursuant to a court ordered or court approved district election plan adopted subsequent to the enactment of the state wide majority vote rule.

Plaintiffs filed a motion for a preliminary injunction against further use of the majority vote requirement on May 31, 1990,

on the ground that the requirement was adopted with a racially discriminatory purpose and had a racially discriminatory effect in violation of Section 2. After conducting an evidentiary hearing July 9–14, 1990, the court denied the motion on July 17, 1990. The court denied injunctive relief, *inter alia,* on the ground that "such relief would not be in the public interest at this point in the election cycle." (Order at 14)

On July 17, 1990, the court entered an order certifying the case as a class action on behalf of all present and future black registered voters of Georgia. On November 14, 1990, the court entered a further order with the consent of plaintiffs dismissing the DeKalb County defendants based upon the stipulation by the state defendants that they would enforce any outstanding order of the court that awarded plaintiffs relief, not only in the election of statewide officers but also in the election of county offices affected by the majority vote requirement. Dismissal of those local defendants was without prejudice to their being added later and with plaintiffs reserving the right to move for defendants' class certification in that event.

On August 9, 1990, the United States filed a similar challenge to the statewide majority vote requirement, *United States v. Georgia,* Civ. No. 1:90–CV–1749 (N.D.Ga). The defendants were essentially identical in both cases, except that the State of Georgia was named as a defendant in *United States v. Georgia, supra,* and not in *Brooks II.* The Dekalb County defendants have also been retained in the United States' case, and those defendants have become representatives of a class of local defendants.

The United States requested an injunction against further use of the majority vote requirement in those jurisdictions where the majority vote requirement produces discriminatory results or where, absent discriminatory results, no legitimate non-racial overriding governmental purpose exists for the continued use of the requirement. Upon motion of the plaintiffs in *Brooks II,* the two majority vote cases were consolidated by order of the court on December 21, 1990. A proposed pretrial order was filed by the parties in the consolidated cases on February 28, 1992, but the court has not entered a pretrial order as of this date.

On July 16, 1992, upon joint motion of the parties in *Brooks II,* which was unopposed by the United States, the court entered an order designating the Honorable Anthony A. Alaimo, Senior Judge for the U.S. District Court for the Southern District of Georgia, to serve as a mediator to mediate toward a successful settlement of the judicial selection and majority vote cases.

D. *The Course of Settlement Dealings Between the Parties.*

On many occasions, the *Brooks* plaintiffs and representatives of the State of Georgia have met to discuss the possibility of settling the claims asserted in these cases. Those discussions become particularly earnest at **\*1125** the time of the 1990 session of the General Assembly. However, notwithstanding the extended good faith efforts of the parties in search of possible settlements, it was not until 1992 that the parties' efforts yielded an agreement that could be the basis of resolving their disputes. As a practical matter, the success of the settlement discussions in 1992 coincided with the efforts of the Honorable Anthony A. Alaimo to serve as a mediator between the parties. Under Judge Alaimo's guidance and direction, the *Brooks* plaintiffs' representatives met with the representatives of the State on a number of occasions from April, 1992 to June, 1992, when all concerned explored a variety of possible ways of resolving the parties' claims, defenses and legitimate interests. An agreement was ultimately reached between the *Brooks* plaintiffs and the State on June 17, 1992, and the terms of their agreement is reflected in the June 17, 1992 Settlement Memorandum of Michael J. Bowers and Laughlin McDonald to the Honorable Anthony A. Alaimo, which has been signed by Attorney General Bowers and Governor Miller on behalf of the State, and by Laughlin McDonald, Tyrone Brooks and others on behalf of the plaintiffs. This agreement is part of the stipulated evidence before the court.

As set forth in that Settlement Memorandum, the settlement itself is contingent upon the United States' approval and concurrence with the settlement regarding both the method of electing Georgia's judges and disposition of the majority vote claims. Pursuant to the June 17, 1992 Settlement Memorandum and the *Brooks II* court's official designation of Judge Alaimo as a mediator in the majority vote cases, further negotiations took place between the United States and the State of Georgia. Those negotiations produced a final Agreement on July 29, 1992 between those parties that was signed by Attorney General Bowers on behalf of the State of Georgia and by John R. Dunne, Assistant Attorney General, Civil Rights Division, Department of Justice, for the United States of America. That Agreement provides terms for the resolution of the claims between the United States and the State of Georgia. It, too, is part of the stipulated evidence before the court.

E. *The Terms of Settlement.*

By entering into this Consent Decree, defendants make no admission of liability and specifically deny plaintiffs' allegations and claims. At the same time, the defendants and plaintiffs acknowledge that, in their respective opinions based on the advice of their counsel, neither party is certain of prevailing on any particular claim or defense in this action. The parties hereto are desirous of ending the lawsuits pending between them, and other lawsuits between the State of Georgia, its officers, and the United States (to which the *Brooks* plaintiffs are not parties). To that end, all of the parties hereto have agreed to resolve the *Brooks I* and *Brooks II* class actions on the following terms and conditions.

1. The complaint in *Brooks I* is hereby amended to allege that the use of at-large, numbered-post elections for appellate court judges, those of the Court of Appeals and the Supreme Court, and for state court judges, using a majority vote requirement, violates Section 2 of the Voting Rights Act.

2. By December 31, 1994, there will be a total of no fewer than 25 black superior court judges serving, which would be a total derived from (1) those serving in existing seats, (2) those serving in enacted but unfilled (frozen) seats, (3) persons appointed to the State Assignment Judgeships, and (4) persons appointed to newly enacted seats in existing circuits prior to December 31, 1994. In addition, by December 31, 1994, five other black persons will be appointed to either state or superior court seats in addition to the number serving as of June 17, 1992.

3. Superior court, state court, and appellate court judges will be subject only to "retention" elections after this order takes effect. That is, any judge who seeks an additional term for the same judicial office will be retained in office by vote of the electorate. The retention election will be nonpartisan, will be held at the time of the regular general election, and will require the affirmative vote of a majority of those voting on the question to retain the judge. The **\*1126** question submitted to the electorate will be substantially in the following form: "Shall ___ be retained as [justice] [judge] of the ___ court for ___ years? ___ yes ___ no."

4. Future appointments to the superior courts shall serve no less than two years prior to standing for a retention election.

5. The present Judicial Nominating Commission (JNC) will be increased by two persons, to serve until December 31,

1994, one of whom will be one of the attorneys for the plaintiffs, and the other of whom will be chosen by the Governor from a list of four names that the plaintiffs will give to the Governor. These names may include the plaintiffs.

6. The Governor and the JNC will be responsible for affirmative outreach to fill existing and upcoming vacancies and the JNC will assist in the implementation of this agreement.

7. In the event any vacancies occur by virtue of a "no vote" in a retention election held prior to December 31, 1994, or in the first retention election for any judge appointed pursuant to Paragraph E(2) of this Order, the then-existing JNC, but augmented pursuant to Paragraph E(5) of this Order, will be responsible for making recommendations to the Governor for the filling of those vacancies.

8. A special category of superior court judges will be created known as State Assignment Superior Court Judgeships, and this category of judges shall exist for a period not to exceed 10 years. Qualified minority lawyers will be appointed as such judges by the Governor, upon review and recommendation by the JNC. State assignment judges will be authorized to serve, by assignment, in any circuit in the state.

9. Gubernatorial appointment will be limited to JNC recommendations until such time as the court's jurisdiction terminates pursuant to Paragraph E(16) of this Order.

10. A new executive order shall be promulgated concerning the JNC, its functions, objectives, and composition, after January 1, 1995, and those portions of that order that are germane to the resolution of the issues in this case shall be adopted and made an order of the court in *Brooks I,* such order to terminate when the Jurisdiction of this court terminates under Paragraph E(16) of this Order. If the parties are unable to agree on the terms of such an order, these differences shall be resolved by the Honorable Anthony A. Alaimo pursuant to Paragraph E(13) of this Order. In the event that the State Bar of Georgia is appointed an ex-officio member of the JNC, then the President of the Georgia Alliance of African–American Attorneys shall be appointed ex officio to the JNC.

11. Subsequent to January 1, 1995, the Judicial Nominating Commission shall make recommendations for the superior, state and appellate courts to the Governor without regard to race, color or ethnic origin and the members thereof shall be

specifically prohibited from discriminating on the basis of race in making said recommendations.

12. Subsequent to January 1, 1995, the Governor of the State of Georgia shall make his/her appointments to the superior, state, and appellate courts without regard to race, color or ethnic origin and he/she shall be prohibited from discriminating in appointments on the basis of race.

13. The Honorable Anthony A. Alaimo shall serve as an arbitrator of disputes concerning the enforcement of this order, until jurisdiction is terminated pursuant to Paragraph E(16) of this order, and in the event of the inability of Judge Alaimo to so serve, the court shall appoint a successor or substitute to Judge Alaimo. Judge Alaimo shall specifically have the authority to oversee the actions of the JNC and the Governor with regard to the appointment of judges under the terms of the order, and he shall be empowered with regard to those appointments occurring on or after January 1, 1995 to review the recommendations and appointments of the JNC and the Governor to ensure that said actions have been made without discrimination on the basis of race, color or ethnic origin. The specific right of the plaintiffs to challenge the actions of the JNC or of the Governor hereunder does not contemplate the right to "second guess" individual appointments, but rather the right of the **\*1127** plaintiffs to challenge the actions of the JNC or the Governor because of a pattern of appointing white applicants over equally or more qualified black applicants.

14. There shall be no residency requirement for appointment to the superior court bench other than residency within the circuit at the time of taking office and the existing requirement prescribed by law concerning residency within the State of Georgia.

15. The goal of the State of Georgia is a diverse judiciary reflective of the population of the State as a whole.

16. The jurisdiction of the court in *Brooks I* shall terminate upon the State achieving a racially diverse appellate, superior and state court bench which shall be reasonably representative of the population of the State as a whole considering among other factors the percentage of African–American attorneys eligible to serve as judges. The State may petition the court for an end to its jurisdiction at any time it deems it has complied with this paragraph.

17. A class action on behalf of all present and future black voters in the State of Georgia has already been certified in both *Brooks I* and *Brooks II*.

18. The plaintiffs' claims in *Brooks I* are hereby dismissed with prejudice. This dismissal, however, does not preclude the plaintiffs from making claims under Section 2 to the system of nominations, appointments, and retention elections that are established pursuant to this Consent Decree. No such challenge, however, may be brought before all judges appointed on or before December 31, 1994 have gone through at least one retention election.

19. This consent decree is conditioned upon approval of a consent decree in *Brooks II* incorporating the terms of the settlement agreement between the parties that relate to the majority vote issues. Specifically, that would include the dismissal of the complaint in *Brooks II* with prejudice, provided that such dismissal would not include the plaintiffs' claim involving use of a majority vote requirement for all offices that are elected state-wide, which claim would remain pending upon entry of said decree. That remaining claim, however, would also be deemed dismissed with prejudice unless plaintiffs file a written demand for trial no sooner than December 31, 1994 and no later than June 15, 1995.

20. This Consent Decree is further conditioned upon the entry of a judgment of dismissal with prejudice of the complaint that has been brought by the United States for the Northern District of Georgia involving its challenge to the use of the majority vote requirement in Georgia; provided, however, said dismissal with prejudice shall not include the United States' claims involving use of the majority vote requirement for all offices elected state-wide and for all offices elected at-large on a countywide basis. Those additional claims, however, would also be deemed dismissed with prejudice unless the United States files a written demand for trial no sooner than December 31, 1994 and no later than June 15, 1995.

21. Upon notification by the parties that the conditions specified in the foregoing paragraphs 19 and 20 have been satisfied, the court will enter an appropriate order making this consent decree the final judgment of the court.

SO ORDERED this __ day of _____, 1994.

— — — — — — —

UNITED STATES DISTRICT

JUDGE

CONSENTED TO:

/s/ M. Laughlin McDonald
/s/ M. Laughlin McDonald
Counsel for Plaintiffs
ACLU Foundation, Inc.
44 Forsyth Street, N.W.
Suite 202
Atlanta, Georgia 30303
404/523–2721

MICHAEL J. BOWERS
Attorney General of the
State of Georgia
Georgia Bar No. 071650

CAROL ATHA COSGROVE

Senior Assistant Attorney
General
 **\*1128**  Georgia Bar No. 189150
132 State Judicial Building
Atlanta, Georgia 30334
404/656–2647

WALBERT & HERMANN

By: /s/ David F. Walbert
By: /s/ David F. Walbert
By: /s/ Georgia Bar No. 730450
100 Peachtree Street
Suite 1010
Atlanta, Georgia 30303
404/523–5000

Attorneys for State Defendants

**All Citations**

59 F.3d 1114

## Footnotes

\*    Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

1    The Constitution of the State of Georgia and various statutes promulgated thereunder provide for a system whereby judges of the state court, superior court, and court of appeals and justices of the supreme court are elected in nonpartisan judicial elections. Ga. Const. art. 6, § 7, ¶ 1 (1983); O.C.G.A. § 15–7–23 (1990). Georgia law, however, also empowers the Governor with the authority to appoint individuals to fill vacancies in the judiciary. Ga. Const. art. 6, § 7, ¶ 3 (1983); O.C.G.A. § 15–7–23 (1990). Thus, as the district court explained:

The Georgia judicial electoral system involves aspects of both election and appointment. The vast majority of judges in this state have reached the bench via appointment. All judges and justices are subject to challenge in open elections at the expiration of their term of office. In reality, however, few incumbents are actually challenged in contested elections, and, of the few incumbents who are challenged, even fewer are defeated at the polls. Nevertheless, under the current system, qualified individuals can run against incumbent judges or justices in open elections and when that occurs, the voters choose who will serve them directly; the candidate having a majority of the votes in the election or the highest number of votes in a run-off wins.

Brooks v. State Bd. of Elections, 848 F.Supp. 1548, 1557 (S.D.Ga.1994) (citation omitted).

2    By order dated February 28, 1994, this injunction was extended until March 1, 1995.

3    We attach hereto as Exhibit A the proposed Consent Decree in its entirety.

4   The State of Georgia subsequently brought a declaratory judgment action under Section 5 of the VRA in the District Court for the District of Columbia. On February 3, 1995, that court entered judgment in favor of the state and declared that the statutes creating superior court judgeships after November 1, 1964, " 'do[ ] not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color' " under section 5 of the Voting Rights Act of 1965. *Georgia v. Reno,* 881 F.Supp. 7, 14 (D.D.C.1995) (quoting 42 U.S.C. § 1973c).

5   Although Plaintiffs and Defendants made a joint motion to the district court for approval of the settlement, Defendants do not contest the district court's rejection of the settlement in this appeal. Instead, Defendants concede in their brief that they "were well aware that the proposed court order stretched to the limit the authority of both the state officials involved and of the district court...." Appellee's Brief at 20. Accordingly, Defendants assert that the district court did not abuse its discretion in rejecting the proposed settlement.

6   In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

7   At oral argument, counsel for the state assured this court that in light of the intervening decision of the District Court for the District of Columbia in *Georgia v. Reno,* see *supra* note 3, the state "certainly has no interest" in reaching another settlement in the Section 2 action.

---

End of Document                                         © 2023 Thomson Reuters. No claim to original U.S. Government Works.

MUNGER, TOLLES & OLSON LLP

*Church of Scientology of Cal. v. United States*,
506 U.S. 9 (1992)

Case: 22-55060, 06/08/2023, ID: 12732148, DktEntry: 96, Page 17 of 41

Church of Scientology of California v. U.S., 506 U.S. 9 (1992)

113 S.Ct. 447, 121 L.Ed.2d 313, 70 A.F.T.R.2d 92-6055, 61 USLW 4003...

113 S.Ct. 447
Supreme Court of the United States

CHURCH OF SCIENTOLOGY
OF CALIFORNIA, Petitioner,

v.

UNITED STATES and Frank S. Zolin.

No. 91–946.
|
Argued Oct. 6, 1992.
|
Decided Nov. 16, 1992.

**Synopsis**

Church appealed from order of the United States District Court for the Central District of California, requiring state court clerk to comply with Internal Revenue Service (IRS) summons. The Court of Appeals for the Ninth Circuit ruled that clerk's compliance with order rendered appeal moot, and church petitioned for certiorari. The Supreme Court, Justice Stevens, held that clerk's compliance summons for production of tapes in clerk's custody recording conversations between church officials and their attorneys did not render church's appeal from order moot.

Vacated and remanded.

**\*\*447** *Syllabus* [*]

**\*9** Pursuant to its jurisdiction under 26 U.S.C. §§ 7402(b) and 7604(a), the District Court ordered a state-court Clerk to comply with a summons issued by the Internal Revenue Service (IRS) for the production **\*\*448** of, *inter alia,* two tapes in the Clerk's custody recording conversations between officials of petitioner Church of Scientology (Church) and their attorneys. Although the Church filed a timely notice of appeal, its request for a stay of the summons enforcement order was unsuccessful, and copies of the tapes were delivered to the IRS while the appeal was pending. The Court of Appeals dismissed the appeal as moot, ruling that no controversy existed because the tapes had already been turned over to the IRS.

*Held:* Compliance with the summons enforcement order did not moot the Church's appeal. Delivery of the tapes to the IRS did not mandate dismissal by making it impossible for the

Court of Appeals to grant the Church "any effectual relief." See *Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293. Although it is now too late to prevent, or to provide a fully satisfactory remedy for, the invasion of privacy that occurred when the IRS obtained the information on the tapes, the Court of Appeals does have power to effectuate a partial remedy by ordering the Government to return or destroy any copies of the tapes that it may possess. Even if the Government is right that under §§ 7402(b) and 7604(a) the jurisdiction of the *district court* is limited to those matters directly related to whether or not the summons should be enforced, the question presented here is whether there was jurisdiction in the *appellate court* to review the allegedly unlawful summons enforcement order. There is nothing in the Internal Revenue Code to suggest that Congress sought to preclude such review, and, indeed, this Court has expressly held that IRS summons enforcement orders *are* subject to appellate review. See *Reisman v. Caplin,* 375 U.S. 440, 449, 84 S.Ct. 508, 513–514, 11 L.Ed.2d 459. Although several Courts of Appeals have accepted the Government's argument in IRS enforcement proceedings, the force of that line of authority is matched by a similar array of decisions reaching a contrary conclusion in proceedings enforcing Federal Trade Commission discovery requests. There is no significant difference between the governing statutes that can explain the **\*10** divergent interpretations, nor any reason to conclude that production of records relevant to a tax investigation should have mootness consequences that production of other business records does not have. Pp. 449–453.

Vacated and remanded.

STEVENS, J., delivered the opinion for a unanimous Court.

**Attorneys and Law Firms**

Eric M. Lieberman, New York City, for petitioner.

Lawrence G. Wallace, Washington, D.C., for respondents.

**Opinion**

Justice STEVENS delivered the opinion of the Court.

Two tapes recording conversations between officials of the Church of Scientology (Church) and their attorneys in July 1980 have been the principal bone of contention in this, and two earlier, legal proceedings.

Church of Scientology of California v. U.S., 506 U.S. 9 (1992)

113 S.Ct. 447, 121 L.Ed.2d 313, 70 A.F.T.R.2d 92-6055, 61 USLW 4003...

In an action filed in the Los Angeles County Superior Court, [1] the Church contended that the defendant had unlawfully acquired possession of the tapes. Pending resolution of that action, the state court ordered its Clerk to take custody of the tapes and certain other documents.

In 1984, in connection with an investigation of the tax returns of L. Ron Hubbard, founder of the Church of Scientology, the Internal Revenue Service (IRS) sought access to the Church documents in the state-court Clerk's possession. [2] **\*11** After the Clerk **\*\*449** was served with an IRS summons, he permitted IRS agents to examine and make copies of the tapes. Thereafter, in a federal action initiated by the Church in the Central District of California, the District Court entered a temporary restraining order directing the IRS to file its copies of the tapes, and all related notes, with the federal court. [3] Those copies were subsequently returned to the Clerk of the state court.

On January 18, 1985, the IRS commenced this proceeding by filing a petition to enforce the summons that had previously been served on the state-court Clerk. [4] The Church intervened and opposed production of the tapes on the ground that they were protected by the attorney-client privilege. After protracted proceedings, including review in this Court, see *United States v. Zolin,* 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989), on April 15, 1991, the District Court entered an order enforcing compliance with the summons. The Church filed a timely notice of appeal and unsuccessfully sought a stay of that order. While the appeal was pending, copies of the tapes were delivered to the IRS. Thereafter, the Court of Appeals ordered the Church to show cause why its appeal **\*12** should not be dismissed as moot. After briefing on the mootness issue, the court dismissed the appeal. It explained:

> "Because it is undisputed that the tapes have been turned over to the IRS in compliance with the summons enforcement order, no controversy exists presently and this appeal is moot." *United States v. Zolin,* No. 91–55506 (CA9, Sept. 10, 1991).

We granted the Church's petition for certiorari to consider the narrow question whether the appeal was properly dismissed as moot. 503 U.S. 905, 112 S.Ct. 1261, 117 L.Ed.2d 490 (1992).

## I

It has long been settled that a federal court has no authority "to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895). See also *Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975); *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971). For that reason, if an event occurs while a case is pending on appeal that makes it impossible for the court to grant "any effectual relief whatever" to a prevailing party, the appeal must be dismissed. *Mills,* 159 U.S., at 653, 16 S.Ct., at 133. In this case, after the Church took its appeal from the April 15 order, in compliance with that order copies of the tapes were delivered to the IRS. The Government contends that it was thereafter impossible for the Court of Appeals to grant the Church any effectual relief. We disagree.

**\*\*450** While a court may not be able to return the parties to the *status quo ante*—there is nothing a court can do to withdraw all knowledge or information that IRS agents may have acquired by examination of the tapes—a court can fashion *some* form of meaningful relief in circumstances such as **\*13** these. Taxpayers have an obvious possessory interest in their records. When the Government has obtained such materials as a result of an unlawful summons, that interest is violated and a court can effectuate relief by ordering the Government to return the records. Moreover, even if the Government retains only copies of the disputed materials, a taxpayer still suffers injury by the Government's continued possession of those materials, namely, the affront to the taxpayer's privacy. A person's interest in maintaining the privacy of his "papers and effects" is of sufficient importance to merit constitutional protection. [5] Indeed, that the Church considers the information contained on the disputed tapes important is demonstrated by the long, contentious history of this litigation. Even though it is now too late to prevent, or to provide a fully satisfactory remedy for, the invasion of privacy that occurred when the IRS obtained the information on the tapes, a court does have power to effectuate a partial remedy by ordering the Government to destroy or return any and all copies it may have in its possession. The availability of this possible remedy is sufficient to prevent this case from being moot. [6]

**\*14** The Government argues, however, that these basic principles are inapplicable in IRS summons enforcement proceedings because of the particular nature of the statute governing such proceedings. Reasoning from the premise that federal courts are empowered to consider only those matters within their jurisdiction, the Government argues that in IRS summons enforcement proceedings the subject-matter jurisdiction of the district court is limited to determining only whether the court should "compel ... production of" the information requested by the summons. 26 U.S.C. §§ 7402(b), 7604(a). See n. 4, *supra*. Once the court has answered that question and compliance has occurred, there is nothing more for the district court to decide and the jurisdiction of the district court evaporates.

We think the Government misconceives the inquiry in this case. The Government may or may not be right that under §§ 7402(b) and 7604(a) the jurisdiction of the *District Court* is limited to those matters directly related to whether or not the summons should be enforced. Indeed, the scope of the district court's jurisdiction under those provisions was the issue over which **\*451** this Court deadlocked in *United States v. Zolin,* 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). [7] The question presented in the **\*15** current incarnation of this case is whether there was jurisdiction in the *appellate court* to review the allegedly unlawful summons enforcement order. On that question, the Government's elaborate statutory argument is largely irrelevant. There is nothing in the statute to suggest that Congress sought to preclude appellate review of district court enforcement orders. To the contrary, we have expressly held that IRS summons enforcement orders *are* subject to appellate review. See *Reisman v. Caplin,* 375 U.S. 440, 449, 84 S.Ct. 508, 513–514, 11 L.Ed.2d 459 (1964). Thus, whether or not there is jurisdiction in the appellate court to review the District Court's order turns not on the subject matter of Congress' jurisdictional grant to the district courts, but on traditional principles of justiciability, namely, whether an intervening event has rendered the controversy moot. And, as we have already explained, this case is not moot because if the summons were improperly issued or enforced a court could order that the IRS' copies of the tapes be either returned or destroyed.

II

We recognize that several Courts of Appeals have accepted the Government's argument in IRS enforcement proceedings, [8] but the force of that line of authority is matched **\*16** by a similar array of decisions reaching a contrary conclusion in proceedings enforcing Federal Trade Commission (FTC) dis-covery requests. [9] There is no signifi- **\*\*452** cant difference between the governing statutes that can explain the divergent interpretations. [10] Nor is there any reason to conclude that **\*17** production of records relevant to a tax investigation should have mootness consequences that production of other business records does not have. Moreover, in construing these provisions of the Internal Revenue Code, the Court has considered it appropriate to rely on its earlier cases involving other statutes, including the Federal Trade Commission Act. See *United States v. Powell,* 379 U.S. 48, 57, 85 S.Ct. 248, 254–255, 13 L.Ed.2d 112 (1964) (citing *United States v. Morton Salt Co.,* 338 U.S. 632, 642–643, 70 S.Ct. 357, 363–364, 94 L.Ed. 401 (1950)).

We therefore conclude that the appeal was improperly dismissed as moot. In so concluding we express no opinion on the merits of the Church's argument that the Government did not establish an adequate evidentiary basis to support the District Court's determination that the tapes fell within the crime-fraud exception to the attorney-client privilege. Nor do we express any opinion about the res judicata contention advanced in the Government's brief in opposition to the petition for certiorari. Brief for United States in Opposition **\*18** 13–14. We simply hold that compliance with the summons enforcement order did not moot the Church's appeal. [11]

**\*\*453** The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

**All Citations**

506 U.S. 9, 113 S.Ct. 447, 121 L.Ed.2d 313, 70 A.F.T.R.2d 92-6055, 61 USLW 4003, 92-2 USTC P 50,562

113 S.Ct. 447, 121 L.Ed.2d 313, 70 A.F.T.R.2d 92-6055, 61 USLW 4003...

## Footnotes

\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1 *Church of Scientology of California v. Armstrong,* No. C420 153.

2 The Commissioner of Internal Revenue, as the delegate of the Secretary of the Treasury, has broad authority to examine the accuracy of federal tax returns. See generally *Donaldson v. United States,* 400 U.S. 517, 523–525, 91 S.Ct. 534, 538–540, 27 L.Ed.2d 580 (1971). Section 7602(a) of the Internal Revenue Code authorizes the Secretary to summon any person to provide documents relevant to such an examination:

   "For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary is authorized—

   "(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry." 26 U.S.C. § 7602(a).

3 *Church of Scientology v. Armstrong,* No. CV 84–9003–HLH (CD Cal., Nov. 27, 1984).

4 Sections 7402(b) and 7604(a) confer jurisdiction on the federal district courts to enforce a summons issued by the IRS. Title 26 U.S.C. § 7402(b) provides:

   "If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, or other data, the district court of the United States for the district in which such person resides or may be found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, or other data."

   Section 7604(a) is virtually identical to § 7402(b) except that the word "records" appears in § 7604(a).

5 The Fourth Amendment provides:

   "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

6 Petitioner also argues that a court can effectuate further relief by ordering the IRS to refrain from any future use of the information that it has derived from the tapes. Such an order would obviously go further towards returning the parties to the *status quo ante* than merely requiring the IRS to return the tapes and all copies thereof. However, as there is no guarantee that the IRS will in fact use the information gleaned from the tapes, it could be argued that such an order would be an impermissible advisory opinion. Cf. *G.M. Leasing*

Church of Scientology of California v. U.S., 506 U.S. 9 (1992)

113 S.Ct. 447, 121 L.Ed.2d 313, 70 A.F.T.R.2d 92-6055, 61 USLW 4003...

*Corp. v. United States,* 429 U.S. 338, 359, 97 S.Ct. 619, 632, 50 L.Ed.2d 530 (1977) (suppression of fruits of illegal IRS search "premature" as issue can be considered "if and when proceedings arise in which the Government seeks to use the documents or information obtained from them"). But see *FTC v. Gibson Products of San Antonio, Inc.,* 569 F.2d 900, 903 (CA5 1978) (court can effectuate relief, despite compliance with FTC subpoena, by requiring FTC to return subpoenaed documents and forbidding FTC to use materials in adjudicatory hearing). Because we are concerned only with the question whether *any* relief can be ordered, we leave the "future use" question for another day. For now, we need only hold that this case is not moot because a court has power to order the IRS to return or destroy any copies of the tapes that it may have in its possession.

7   In *Zolin,* the District Court enforced the IRS summons, but placed restrictions on the IRS' ability to disclose the summoned materials to any other government agency. The Ninth Circuit affirmed, *United States v. Zolin,* 809 F.2d 1411, 1416–1417 (1987), and we granted certiorari in part to consider whether the District Court, in conditioning its enforcement of the IRS summons, exceeded its jurisdiction under §§ 7402(b) and 7604(a). *Zolin,* 491 U.S., at 556, 109 S.Ct., at 2622–2623. We were evenly divided on that question and therefore affirmed the Ninth Circuit. *Id.,* at 561, 109 S.Ct., at 2625. The issue still divides the lower courts. Compare *United States v. Zolin,* 809 F.2d, at 1416–1417, and *United States v. Author Services, Inc.,* 804 F.2d 1520, 1525–1526 (CA9 1986) (district court has "considerable" discretion to set terms of enforcement order), opinion amended, 811 F.2d 1264 (1987), with *United States v. Barrett,* 837 F.2d 1341 (CA5 1988) (en banc) (district court lacks authority to "conditionally enforce" IRS summons; inquiry limited to single question of whether summons should be enforced), cert. denied, 492 U.S. 926, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989).

8   *United States v. Kersting,* 891 F.2d 1407, 1410, n. 8 (CA9 1989), cert. denied, 498 U.S. 812, 111 S.Ct. 49, 112 L.Ed.2d 25 (1990); *Hintze v. IRS,* 879 F.2d 121, 124–125 (CA4 1989); *United States v. Church of World Peace,* 878 F.2d 1281 (CA10 1989); *United States v. Sherlock,* 756 F.2d 1145, 1146–1147 (CA5 1985); *United States v. First Family Mortgage Corp.,* 739 F.2d 1275, 1278–1279 (CA7 1984); *United States v. Kis,* 658 F.2d 526, 533 (CA7 1981), cert. denied, 455 U.S. 1018, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982); *United States v. Equity Farmers Elevator,* 652 F.2d 752 (CA8 1981); *United States v. Silva & Silva Accountancy Corp.,* 641 F.2d 710, 711 (CA9 1981); *United States v. Deak–Perera Int'l Banking Corp.,* 610 F.2d 89 (CA2 1979); *Kurshan v. Riley,* 484 F.2d 952 (CA4 1973); *United States v. Lyons,* 442 F.2d 1144, 1145 (CA1 1971). But see *Gluck v. United States,* 771 F.2d 750 (CA3 1985).

9   See *FTC v. Gibson Products of San Antonio, Inc.,* 569 F.2d, at 903 (compliance with district court order enforcing FTC subpoena does not moot appeal; court can effectuate relief by requiring FTC to return subpoenaed documents and forbidding FTC from using materials in adjudicatory hearing); *FTC v. Ernstthal,* 197 U.S.App.D.C. 174, 175, 607 F.2d 488, 489 (1979) (compliance with FTC subpoena does not moot appeal where court can order FTC to return subpoenaed documents); *Atlantic Richfield Co. v. FTC,* 546 F.2d 646, 650 (CA5 1977) (same); *FTC v. Browning,* 140 U.S.App.D.C. 292, 293–294, n. 1, 435 F.2d 96, 97–98, n. 1 (1970) (same). Cf. *FTC v. Invention Submission Corp.,* 296 U.S.App.D.C. 124, 127, n. 1, 965 F.2d 1086, 1089, n. 1 (1992) (compliance with district court order enforcing FTC civil investigative demand pursuant to 15 U.S.C. § 57b–1(e) does not moot appeal as court could order FTC "to return responsive materials and to destroy any records derived from them"); *Casey v. FTC,* 578 F.2d 793 (CA9 1978) (action seeking to enjoin FTC investigation presents live controversy despite parties' compliance with FTC subpoena as appellate court can order FTC to return wrongfully subpoenaed records). See also *Government of Territory of Guam v. Sea–Land Service, Inc.,* 294 U.S.App.D.C. 292, 295, 958 F.2d 1150, 1153 (1992) (compliance with district court order enforcing Federal Maritime Commission discovery order does not moot appeal where party seeks return of discovered materials).

Church of Scientology of California v. U.S., 506 U.S. 9 (1992)

113 S.Ct. 447, 121 L.Ed.2d 313, 70 A.F.T.R.2d 92-6055, 61 USLW 4003...

There is no merit to the Government's contention that the FTC cases are distinguishable in that they involve adjudicative, as opposed to investigative, subpoenas. While *Gibson Products* involved an adjudicative subpoena, *Invention Submission,* Casey, and *Atlantic Richfield* all involved investigative subpoenas.

10    In fact, the summons enforcement provisions of the Internal Revenue Code "closely paralle[l] the corresponding provisions of the Federal Trade Commission Act. See Handler, Recent Antitrust Developments —1964, 63 Mich.L.Rev. 59, 90 (1964). Section 9 of the FTC Act provides, in pertinent part:

"Any of the district courts of the United States ... may, in case of contumacy or refusal to obey a subpoena issued to any person, partnership, or corporation issue an order requiring such person, partnership, or corporation ... to produce documentary evidence if so ordered...." 38 Stat. 722, as amended, 15 U.S.C. § 49.

In the words of Professor Handler:

"Section 7602 of the Internal Revenue Code authorizes the Secretary of the Treasury or his delegate to summon taxpayers or other witnesses to testify and to produce relevant and material documents. Section 9 of the FTC Act grants the same power to the Commission. Should a recipient of a summons or subpoena refuse to comply, both statutes afford the same enforcement procedures. In neither case is the administrative subpoena self-executing: obedience can be obtained only by court order. In addition, both statutes, which are in *pari materia,* make it a criminal offense to 'neglect' to appear or to produce subpoenaed documents." 63 Mich.L.Rev., at 91 (footnotes omitted).

11    In reaching this conclusion, we reject petitioner's "fall back" argument that even if compliance with a summons enforcement order by the subject of the IRS investigation moots an appeal, compliance by a disinterested third party—here, the Clerk of the Los Angeles Superior Court—does not. Brief for Petitioner 25–34; Reply Brief for Petitioner 16–18. We agree with the Government that a "difference in the method of compliance does not create a distinction for the purpose of the constitutional case or controversy requirement." Brief for United States 30. This case presents a justiciable controversy not because a third party complied with the summons enforcement order, but because petitioner has a stake in the outcome of the proceeding and a federal court can effectuate relief should petitioner prevail on the merits.

There is a distinction in the law between the enforcement of discovery orders directed at parties and the enforcement of discovery orders directed at disinterested third parties, but that distinction derives from concerns regarding finality, not mootness. As a general rule, a district court's order enforcing a discovery request is not a "final order" subject to appellate review. A party that seeks to present an objection to a discovery order immediately to a court of appeals must refuse compliance, be held in contempt, and then appeal the contempt order. See *United States v. Ryan,* 402 U.S. 530, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971). However, under the so-called *Perlman* doctrine, see *Perlman v. United States,* 247 U.S. 7, 38 S.Ct. 417, 62 L.Ed. 950 (1918), a discovery order directed at a disinterested third party is treated as an immediately appealable final order because the third party presumably lacks a sufficient stake in the proceeding to risk contempt by refusing compliance. *Ibid.* See generally 15B C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3914.23, pp. 156–167 (2d ed. 1992). This distinction has no bearing on this case because a district court order enforcing an IRS summons is an appealable final order. See *Reisman v. Caplin,* 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964). There is no "third-party exception" because there is no general rule barring immediate appeal of IRS summons enforcement orders.

---

**End of Document**                                                                         © 2023 Thomson Reuters. No claim to original U.S. Government Works.

MUNGER, TOLLES & OLSON LLP

*United States v. Sprint Commc'ns, Inc.*,
855 F.3d 985 (9th Cir. 2017)

97 Fed.R.Serv.3d 872, 17 Cal. Daily Op. Serv. 4007, 2017 Daily Journal D.A.R. 4013

855 F.3d 985
United States Court of Appeals, Ninth Circuit.

UNITED STATES of America, Plaintiff-Appellee,
John C. Prather, Applicant-in-Intervention-Appellant,
v.
SPRINT COMMUNICATIONS, INC., FKA Sprint
Nextel Corporation; Sprint PCS, Defendants-Appellees.

No. 14-17434
|
Argued and Submitted September
14, 2016 San Francisco, California
|
Filed April 28, 2017

**Synopsis**

**Background:** Government brought action under the False Claims Act (FCA) against telecommunications company. Relator, who previously brought qui tam action under FCA against the company, moved to intervene as of right. The United States District Court for the Northern District of California, No. 3:14-cv-00962-CRB, Charles R. Breyer, J., denied motion. Relator appealed.

**Holdings:** The Court of Appeals, Berzon, Circuit Judge, held that:

as matter of first impression, reversing District Court's order could afford relator possible relief, and thus, government's settlement agreement with company and dismissal of action did not moot relator's appeal;

relator lacked "significantly protectable interest" in government's FCA action, and thus was not entitled to intervene as of right; and

FCA's qui tam recovery provisions allowing relator to recover portion of proceeds of FCA action or settlement did not apply to relators jurisdictionally barred under public disclosure bar set forth in the FCA prior to 2010 amendments.

Affirmed.

**Procedural Posture(s):** On Appeal.

**Attorneys and Law Firms**

**\*987** John G. Balestriere (argued) and Jillian L. McNeil, Belstriere Fariello, New York, New York, for Applicant-in-Intervention-Appellant.

Kimberly Friday (argued) and Steven J. Saltiel, Assistant United States Attorneys; Alex G. Tse, Chief, Civil Division; United States Attorney's Office, San Francisco, California, for Plaintiff-Appellee.

Edward C. Barnidge (argued) and Benjamin M. Stoll, Williams & Connolly LLP, Washington, D.C.; David F. Taylor, Perkins Coie LLP, Seattle, Washington; for Defendants-Appellees.

Appeal from the United States District Court for the Northern District of California, Charles R. Breyer, District Judge, Presiding, D.C. No. 3:14-cv-00962-CRB

Before: Ronald M. Gould and Marsha S. Berzon, Circuit Judges, and William K. Sessions III, [**] District Judge.

**OPINION**

BERZON, Circuit Judge:

John C. Prather sought to intervene as of right in a False Claims Act ("FCA") suit brought by the United States ("Government") against Sprint Communications, Inc. ("Sprint"). Whether Prather had the significantly protectable interest required to support his motion to intervene depends on whether he would have been entitled to any recovery if the Government had intervened in his 2009 *qui tam* FCA action. *See* Fed. R. Civ. P. 24(a)(2); *Prather v. AT&T*, 847 F.3d 1097 (9th Cir. 2017) ("*Prather I*"). We conclude that Government intervention in Prather's *qui tam* action could not have secured him any right to a share of the proceeds from that action and therefore affirm the district court's order.

**\*988 BACKGROUND**

In 2009, Prather filed a *qui tam* FCA action against Sprint and four other telecommunications companies, alleging that the companies were defrauding federal and state governments by overcharging them for electronic surveillance services. The Government elected not to intervene in Prather's *qui tam* action. In November 2013, the district court

concluded that Prather could not show he was an "original source" of publicly disclosed information regarding the telecommunications companies' allegedly fraudulent activities and dismissed Prather's *qui tam* suit for lack of jurisdiction. We recently affirmed the district court's dismissal of Prather's *qui tam* action. *Prather I*, 847 F.3d at 1108.

While Prather's appeal of *Prather I* was pending, the Government filed its own FCA suit against Sprint. That action was transferred to the same district judge who had dismissed Prather's case. Prather moved to intervene in the Government's FCA action, maintaining that (1) the Government was pursuing an "alternate remedy" to Prather's *qui tam* action by filing its own FCA action instead of intervening in his earlier FCA suit; (2) under the FCA, he had the "same rights" in the Government's "alternate remedy" proceeding as he would have had in his *qui tam* action; and (3) he therefore had a right to a share of the proceeds from any award or settlement in this litigation. *See* 31 U.S.C. § 3730(c)(5) (2006). [1]

The district court denied Prather's motion to intervene on the basis of its dismissal of Prather's *qui tam* action. Because Prather could not bring a successful *qui tam* action on related claims, the district court concluded, he had no standing to intervene in the Government's action. Prather timely appealed the district court's order.

## DISCUSSION

Under the FCA, private individuals with information about fraud against the Government may bring *qui tam* actions on behalf of the United States. The Government may elect to (1) intervene in such an action and take over its prosecution, 31 U.S.C. § 3730(b)(2); (2) "pursue its claim through any alternate remedy available to the Government," instead, *id.* § 3730(c)(5); or (3) decide not to take any action, allowing the private individual, known as the "relator," to pursue the claim to completion, *id.* § 3730(c)(3). In any of those scenarios, the relator who brought the *qui tam* action generally has a right to a share of any proceeds from the action. *Id.* § 3730(d). If the Government pursues an alternate remedy, the relator "shall have the same rights in such proceeding as [he] would have had if" the Government had intervened in the *qui tam* action. *Id.* § 3730(c)(5).

Prather asserts that the Government's own action against Sprint is an "alternate **\*989** remedy" pursued in lieu of

intervention in his earlier *qui tam* action. He maintains that he is therefore entitled to the same share of the Government's proceeds resulting from this action against Sprint as he would have obtained if his *qui tam* action had gone forward. *See id.* On that basis, he contends, he was entitled to intervene as of right. *See Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 817 (9th Cir. 2001) ("*Southwest Center*") (setting out the four-prong test for Federal Rule of Civil Procedure Rule 24(a) intervention as of right).

After the district court's denial of Prather's motion to intervene, the Government and Sprint reached a settlement, and the district court accordingly dismissed the case. Before turning to the merits of Prather's appeal, we consider whether this appeal is now moot.

### I

The parties have not raised the mootness issue. Nonetheless we address the issue *sua sponte*, because, if "events change such that the appellate court can no longer grant 'any effectual relief whatever to the prevailing party,' any resulting opinion would be merely advisory," and the court would lack subject matter jurisdiction. *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 628 (9th Cir. 2016) (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000)). Here, we consider the effect of the settlement and voluntary dismissal of the case in which Prather sought to intervene.

In some situations, the entry of final judgment in a case moots a putative-intervenor's appeal from the denial of his motion to intervene. *West Coast Seafood Processors Ass'n v. NRDC*, 643 F.3d 701 (9th Cir. 2011), for example, held that this court could not grant the appellant "any 'effective relief' by allowing it to intervene" "in a case that the district court ha[d] since decided, through [an] Order on Remedy and the subsequent final judgment, from which neither party ha[d] appealed." *Id.* at 704. In other circumstances, however, an intervention controversy can remain live even after final judgment is entered in the underlying case. *DBSI/TRI IV Ltd. Partnership v. United States*, 465 F.3d 1031 (9th Cir. 2006), for instance, concluded that the appeal in that case was not moot, "because, if it were concluded on appeal that the district court had erred in denying the intervention motion, and that the applicant was indeed entitled to intervene in the litigation, then the applicant would have standing to appeal

the district court's judgment." *Id.* at 1037 (quoting *Canatella v. California*, 404 F.3d 1106, 1109 n.1 (9th Cir. 2005)).

Outside of the special putative class action context, we have not specifically addressed whether the original parties' settlement after the denial of an intervention motion invariably moots the appeal of that denial. *Cf. Alaska v. Suburban Propane Gas Corp.*, 123 F.3d 1317, 1320 (9th Cir. 1997) (discussing the special intervention standard for motions to intervene to appeal denial of class certification). But at least three other circuits have considered the question, and all have held that the dismissal of an underlying case following settlement does not necessarily render moot a putative-intervenor's appeal. *See CVLR Performance Horses, Inc. v. Wynne*, 792 F.3d 469, 475–76 (4th Cir. 2015) (settlement in civil RICO action); *Purcell v. BankAtl. Fin. Corp.*, 85 F.3d 1508, 1511 n.3 (11th Cir. 1996) (class action settlement); *FDIC v. Jennings*, 816 F.2d 1488, 1491 (10th Cir. 1987) (settlement between agency and private persons). Most recently, after considering *DBSI* and *West Coast Seafood* along with more directly relevant cases from several other circuits, the Fourth Circuit concluded:

> We find more persuasive the reasoning of those courts holding that dismissal of **\*990** the underlying action does not automatically moot a preexisting appeal of the denial of a motion to intervene. This is so because in many cases, the resolution of an action between the original parties is not determinative of the defendant's liability with respect to other potential plaintiffs. In these circumstances, when the motion to intervene is made while the controversy is live and the subsequent disposition of the case does not provide the relief sought by the would-be intervenors (for example, money damages, as Appellants seek here), we can provide an effective remedy on appeal and therefore have jurisdiction.

*CVLR Performance Horses*, 792 F.3d at 475.

We agree with the Fourth Circuit, for the reasons it gave, that the parties' settlement and dismissal of a case after the denial of a motion to intervene does not as a rule moot a putative-intervenor's appeal. We note that to hold otherwise "might well provide incentives for settlement that would run contrary to the interests of justice." *Id.* at 474–75 (quoting *FDIC*, 816 F.2d at 1491).

Our question, then, is whether in the particular circumstances here, the settlement and dismissal of the underlying action "make[ ] it impossible for the court to grant 'any effectual relief whatever' " to the putative intervenor even if we were to determine that the district court erred in denying his intervention. *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293 (1895)). Our conclusion is that reversing the district court's order could afford Prather a possible avenue to some remedy, so the case is not moot.

Although we do not yet consider the merits, the FCA guides our preliminary consideration of whether Prather might have anything left to gain from this court deciding his intervention appeal. Prather moved to intervene in the Government's action against Sprint so he could be afforded the "same rights" he would have received had the Government instead intervened in his *qui tam* FCA action. *See* 31 U.S.C. § 3730(c)(5). The "same rights" afforded under the statute would include a right to the same share of the proceeds as in the disposition of a *qui tam* FCA action. *See id.* § 3730(d). The settlement agreement between the Government and Sprint did not provide Prather with any such relief. Additionally, the "same rights" afforded in an alternate remedy proceeding would include the relator's right to object to the Government's direct settlement of an action with a defendant. *See id.* § 3730(c)(2)(B). Upon a relator's objection, the district court would need to determine, "after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances." *Id.*

If we were to conclude Prather had a right to intervene in the Government's FCA action, he might be able to object to the settlement or otherwise seek his share of the proceeds from the Government. As it thus does not appear *impossible* for Prather to receive "any effectual relief whatever" if we determine that the district court erred in denying his motion to intervene as of right, *Church of Scientology of Cal.*, 506 U.S. at 12, 113 S.Ct. 447, we conclude that the Government's settlement agreement with Sprint and the dismissal of the

underlying action do not moot this appeal. We therefore turn to the merits.

## II

### A

To intervene as of right under Federal Rule of Civil Procedure 24(a)(2), an applicant must satisfy a four-part test:

> **\*991** (1) the application for intervention must be timely; (2) the applicant must have a 'significantly protectable' interest relating to the property or transaction that is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must not be adequately represented by the existing parties in the lawsuit.

*Southwest Center*, 268 F.3d at 817 (quoting *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 836 (9th Cir. 1996)). In denying Prather's motion to intervene, the district court held that Prather did not "have standing to intervene," because "he cannot bring a successful *qui tam* action." On appeal, the parties contest only whether Prather met the second prong of the intervention standard, an issue we review de novo. *See United States ex rel. McGough v. Covington Techs. Co.*, 967 F.2d 1391, 1393–94 (9th Cir. 1992).

An applicant seeking intervention is held to have "a 'significant protectable interest' in an action if (1) [the applicant] asserts an interest that is protected under some law, and (2) there is a 'relationship' between [the applicant's] legally protected interest and the plaintiff's claims." *Donnelly v. Glickman*, 159 F.3d 405, 409 (9th Cir. 1998) (quoting *Nw. Forest Res. Council*, 82 F.3d at 837). The district court based its denial of Prather's motion to intervene here on its earlier dismissal of Prather's *qui tam* action. As Prather was not able to bring a *qui tam* action, the district court concluded, he had no rights to protect by intervening here. *See Prather v. AT &*

*T, Inc.*, 996 F.Supp.2d 861, 871 (N.D. Cal. 2013), *aff'd*, 847 F.3d at 1108.

Prather contends, however, that the district court failed to consider the import of the Government's decision not to intervene in his *qui tam* case. According to Prather, he had a significant protectable interest, and his motion to intervene as of right therefore should have been granted, because his interest in this case is (1) the same as his interest would have been if the Government had intervened in his *qui tam* action; (2) protected under FCA § 3730(c)(5) and 3730(d); and (3) related to the Government's claims for recovery in this action. We cannot agree.

Section 3730(c)(5) protects Prather's rights only to the extent his rights would have been protected had the Government intervened in his *qui tam* action. As it turns out, if the Government had intervened in that action, Prather would not have been entitled to any recovery. He therefore lacks a significantly protectable interest in this case, the Government's separate action against Sprint.

### B

Prather's contention that he would have been entitled to a relator's share had the Government intervened in his *qui tam* action is foreclosed by a key Supreme Court case interpreting the FCA, *Rockwell International Corp. v. United States*, 549 U.S. 457, 127 S.Ct. 1397, 167 L.Ed.2d 190 (2007). Where a *qui tam* action is brought on the basis of publicly disclosed information, the pre-2010 FCA mandated "a clear and explicit withdrawal of jurisdiction" if the action is not *brought* by the Government or an "original source." *Id.* at 468, 127 S.Ct. 1397 (emphasis omitted). *Rockwell* held that a non-original-source relator's jurisdictional defect is not cured by the Government's intervention. *Id.* at 476–78, 127 S.Ct. 1397.

In *Rockwell*, the Government intervened in the relator's *qui tam* action; the court entered judgment for the Government and the relator. *Id.* at 464–66, 127 S.Ct. 1397. The defendant then filed a post-verdict motion to dismiss the relator's claims on **\*992** the grounds that (1) the relator was not an original source of the publicly disclosed information on which liability was based, and (2) the court therefore lacked jurisdiction to enter judgment in favor of the relator. *Id.* at 466, 127 S.Ct. 1397. The relator and the Government maintained that the Government's intervention provided an independent basis of jurisdiction, and "any inquiry into [the relator]'s original-

source status ... was unnecessary because the government had intervened, making this an 'action brought by the Attorney General.' " *Id.* at 477, 127 S.Ct. 1397. The Court squarely rejected the argument, holding that "[a]n action brought by a private person does not become one brought by the Government just because the Government intervenes and elects to 'proceed with the action.' " *Id.*

Prather's argument that he is entitled to some FCA recovery (and thus to intervene here) largely repeats the rejected argument in *Rockwell*. Under *Rockwell*, had the Government intervened in Prather's *qui tam* action, Prather's case still would have been dismissed under the former public disclosure bar. At that point, "once [Prather] ha[d] been determined to lack the jurisdictional prerequisites for suit," the FCA action would have "become[ ] an action brought by the Attorney General." *See id.* at 478, 127 S.Ct. 1397. Prather, that is, could have continued to pursue *his qui tam* action against Sprint even if the Government had intervened, although the Government could have gone forward on its own behalf.

But the precise issue here is not whether Prather could have continued as a relator in the suit. Instead, it is whether he would have been entitled to any recovery if the Government had intervened and, after his relator claim was dismissed, continued the suit on its own behalf. As the Third Circuit noted in *U.S. ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97 (3d Cir. 2000), "[i]t would not necessarily follow that [dismissed] relators could not be awarded a share of the ... proceeds" from a successful Government-prosecuted FCA action, because "Congress may enact a statute providing for the payment of a reward or bounty to a non-party who assists the government's enforcement efforts." *Id.* at 103. *Merena* is correct, of course, that Congress could have provided for a reward in these circumstances. But it did not, as several considerations confirm.

First, *Rockwell*'s holding "that the District Court lacked jurisdiction to enter judgment in favor of [the jurisdictionally barred relator]," essentially forecloses Prather's argument that such a reward or bounty is available to him under the statute. 549 U.S. at 479, 127 S.Ct. 1397. In setting aside entirely the monetary judgment entered in favor of the relator while preserving the Government's judgment, *Rockwell* necessarily indicated that a jurisdictionally barred relator is not entitled to *any* recovery under § 3730. *Id.* at 478–79, 127 S.Ct. 1397.

Second, review of the language and structure of § 3730 supports this conclusion. A relator is entitled to share in the proceeds from an FCA action only if (1) the Government chooses not to intervene and the relator proceeds as the plaintiff on his own, 31 U.S.C. § 3730(d)(2), or (2) "the Government proceeds with an action *brought by a [private] person*," *id.* § 3730(d)(1) (emphasis added). Just the latter provision is relevant here, as Prather argues it is the Government's intervention that would have entitled him to a share of the award.

But, as *Rockwell* made clear, once a relator is determined to lack the jurisdictional prerequisites to bring a *qui tam* FCA action, the case "becomes an action *brought by the Attorney General.*" 549 U.S. at 478, 127 S.Ct. 1397 (emphasis added). *Rockwell* contrasted that transformative **\*993** effect of the dismissal of a relator's suit under the public disclosure bar with the statute's other provisions—citing, in particular, the relator's award provisions of § 3730(d)—that apply to "actions brought by a relator where the government intervenes but does not oust the relator." *Id.* at 477–78, 127 S.Ct. 1397. If the Government takes over a case after a jurisdictionally barred relator is dismissed, the relator cannot collect an award under § 3730(d)(1), because that provision becomes inapplicable. In other words, once the action "brought by a [private] person" under § 3730(b) is dismissed for lack of subject matter jurisdiction, the hook for the relator's award provision, § 3730(d)(1), no longer exists.

Third, as we explained in *United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953 (9th Cir. 1995), "[t]he right to recovery clearly exists primarily to give relators incentives to bring claims ... [and] the extent of the recovery is tied to the importance of the relator's participation in the action and the relevance of the information brought forward." *Id.* at 963–64 (footnote omitted). For instance, when the Government intervenes in a case, the statute generally mandates that the court award 15 to 25 percent of the proceeds to the relator, "depending upon the extent to which the person substantially contributed to the prosecution of the action." 31 U.S.C. § 3730(d)(1). The statute prescribes a smaller recovery bracket —zero to ten percent of the proceeds from an action—for relators who bring cases primarily based on information that had already been publicly disclosed by someone other than the relator. *Id.* § 3730(d)(1). Again, in determining the exact size of an award within that smallest bracket, courts are instructed to "tak[e] into account the significance of the information and the role of the person bringing the action in advancing the case to litigation." [2] *Id.*

These prescriptions regarding the size of a relator's recovery play an important role, alongside the public disclosure bar, in advancing the dual purposes of the 1986 FCA amendments: (1) "to encourage private individuals who are aware of fraud being perpetrated against the Government to bring such information forward," H.R. Rep. No. 99-660, at 23 (1986); and (2) "to discourage parasitic suits brought by individuals with no information of their own to contribute to the suit," *United States ex rel. Zaretsky v. Johnson Controls, Inc.*, 457 F.3d 1009, 1017 (9th Cir. 2006) (internal quotation marks and citation omitted), *abrogated on other grounds by United States. ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121, 1127–29 (9th Cir. 2015) (en banc). Allowing non-original-sources to recover under § 3730(d)(1) would not encourage actual sources of information about fraud to come forward, but instead encourage "parasitic" suits by "opportunistic plaintiffs who have no significant information to contribute," apart from information gleaned from others' public disclosures. [3] *See* **\*994** *Graham Cty. Soil & Water Conserv. Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 294, 130 S.Ct. 1396, 176 L.Ed.2d 225 (2010) (quoting *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994)). Where the purpose of encouraging individuals with knowledge of possible fraud against the federal government is not served, "the relator should not be so rewarded." *United States ex rel. Biddle v. Bd. of Trs. of Leland Stanford, Jr. Univ.*, 161 F.3d 533, 539 (9th Cir. 1998).

We conclude that the statute's *qui tam* recovery provisions in § 3730(d) do not apply to relators jurisdictionally barred under § 3730(e)(4).

## C

That the Government has pursued and secured a remedy against Sprint in this separate litigation does not alter our analysis or strengthen Prather's claim to a monetary award. And that is so, contrary to Prather's submission, even if the Government's remedy was based on the same allegations Prather made in his *qui tam* suit or arose out of an investigation prompted by Prather's initial *qui tam* action.

To recap: The FCA protects rights to relief for both the Government and a proper relator, but the Government is always the real party in interest. *See Killingsworth*, 25 F.3d at 720. Even if a relator files a *qui tam* action on behalf of the Government under § 3730(b), "the Government may elect

to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty." 31 U.S.C. 3730(c)(5). If the Government chooses to pursue a remedy through some other proceeding, the FCA mandates that the relator be afforded "the same rights in such proceeding as [he] would have had if the action had continued under [§ 3730, the FCA's civil action provisions]." *Id.*

The alternate remedy provisions have no application here. Prather cannot obtain a monetary award due to the Government's pursuit of an "alternate remedy" to a proceeding in which he could not possibly have obtained any remedy.

An Eighth Circuit case addressing a similar situation, *United States ex rel. Newell v. City of St. Paul*, 728 F.3d 791 (8th Cir. 2013), is informative. As in Prather's *qui tam* action, the Government declined to intervene in Newell's FCA action, and the relator's action was dismissed on the basis of the public disclosure bar. *Id.* at 795. Newell appealed the district court's dismissal order, arguing that the Government had used his *qui tam* action as a bargaining chip in a settlement agreement in an unrelated, non-FCA case. *Id.* at 798. Newell contended that the Government's "settlement, unlike a discretionary decision not to intervene in a *qui tam* action, enabled the government to obtain an 'alternate remedy' that entitle[d] him to a share of the settlement proceeds under § 3730(c)(5) of the FCA." *Id.* The Eighth Circuit disagreed, ruling that "*even if* the ... [Government's settlement was] an 'alternate remedy,' Newell would not be entitled to a share of that remedy because his FCA claims were subject to dismissal under the public disclosure bar." *Id.* at 799.

As in *Newell*, the Government's FCA action and its settlement with Sprint do not alter the district court's prior determination, which we affirmed, *Prather I*, 847 F.3d at 1108, that Prather was jurisdictionally barred from bringing his 2009 *qui tam* action. Although the asserted connection **\*995** between Newell's *qui tam* action and the Government's settlement with the defendant on an unrelated matter was more attenuated than the asserted connection here, the precise relationship between the Government's action against Sprint and Prather's *qui tam* action is of no moment.

Here is why: Assuming that the Government brought this action against Sprint on the same grounds upon which Prather had brought his *qui tam* action, as Prather alleges, [4]

Case: 22-55060, 06/08/2023, ID: 12732148, DktEntry: 96, Page 30 of 41

United States v. Sprint Communications, Inc., 855 F.3d 985 (2017)
97 Fed.R.Serv.3d 872, 17 Cal. Daily Op. Serv. 4007, 2017 Daily Journal D.A.R. 4013

Prather's failure to meet the original source requirement is still preclusive of any judgment in his favor. Because of that failure, dismissal of Prather's claim for monetary recovery was mandatory. That is, Prather's suit could not have continued as a § 3730(b) *qui tam* action regardless of the Government's actions in that case or in this litigation. *See Rockwell,* 549 U.S. at 477, 127 S.Ct. 1397. Rather, like the relator in *Rockwell,* Prather's private action would have been dismissed even if the Government had intervened in it, and the case would have continued as a § 3730(a) action—an FCA action "brought by the Attorney General" alone. *See id.* at 478, 127 S.Ct. 1397. In such a posture, Prather, like Newell, would have had *no* right to recovery, and so cannot recover here under the "alternate remedy" provision of the statute. The equivalent of no right to recovery (in the original action) is no right to recovery (in this action).

In sum, Prather cannot obtain a monetary bounty under the FCA on his jurisdictionally barred claims, whether in the action he brought as a *qui tam* plaintiff, via the "same rights" provision of § 3730(c)(5), or, as he attempts to do here, by joining a related FCA action brought by the Government after the dismissal of his *qui tam* action.

## CONCLUSION

The appeal of the district court's denial of Prather's motion to intervene is not moot. On the merits, however, Prather did not have a significantly protectable interest in the Government's FCA action against Sprint. His prior filing of a related, but jurisdictionally barred, *qui tam* action did not entitle him to any award under the FCA. We therefore conclude that Prather was not entitled to intervene as of right in the Government's FCA action against Sprint.

**AFFIRMED.**

**All Citations**

855 F.3d 985, 97 Fed.R.Serv.3d 872, 17 Cal. Daily Op. Serv. 4007, 2017 Daily Journal D.A.R. 4013

## Footnotes

\*\*   The Honorable William K. Sessions III, United States District Judge for the District of Vermont, sitting by designation.

1   Section 3730(c)(5) provides, in relevant part:

> [T]he Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty. If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section.

31 U.S.C. § 3730(c)(5) (2006). Henceforth all citations to this section of the FCA, 31 U.S.C. § 3730, reference the version in effect prior to the effective date of the 2010 amendments to the statute, which significantly changed the public disclosure and "original source" provisions under which Prather's 2009 *qui tam* action was dismissed. In particular, the 2010 amendments eliminated the designation of the public disclosure provision as jurisdictional. *Prather I,* 847 F.3d at 1102–03.

2   If the relator prosecutes the action alone after the Government decides not to intervene, the statute prescribes a larger relator's share of 25 to 30 percent of the proceeds. *Id.* § 3730(d)(2). The bulk of the proceeds still goes to the Government, which is the real party in interest in all FCA actions, whether or not it intervenes. *U.S. ex rel. Killingsworth v. Northrop Corp.,* 25 F.3d 715, 720 (9th Cir. 1994).

3   Prather's argument that the first-to-file rule, 31 U.S.C. § 3730(b)(5), and similar procedural hurdles would sufficiently protect from rampant filing of FCA actions by non-original-sources is meritless. Reasoning that an opposite holding would "permit opportunistic plaintiffs with no inside information to displace actual insiders

with knowledge of the fraud," we have held that, "in a public disclosure case, the first-to-file rule of § 3730(b)(5) bars only subsequent complaints filed after a complaint that fulfills the jurisdictional prerequisites of § 3730(e)(4)." *United States ex rel. Campbell v. Redding Med. Ctr.*, 421 F.3d 817, 824–25 (9th Cir. 2005). Our reasoning in *Campbell* applies here, as well.

4    "Courts are to take all well-pleaded, nonconclusory allegations in the motion to intervene, the proposed complaint or answer in intervention, and declarations supporting the motion as true absent sham, frivolity or other objections." *Southwest Center*, 268 F.3d at 820.

---

End of Document                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

MUNGER, TOLLES & OLSON LLP

*W. Coast Seafood Processors Ass'n v. NRDC*,
643 F.3d 701 (9th Cir. 2011)

643 F.3d 701
United States Court of Appeals, Ninth Circuit.

WEST COAST SEAFOOD PROCESSORS
ASSOCIATION, Applicant–in–intervention–Appellant,
v.
NATURAL RESOURCES DEFENSE
COUNCIL, INC.; Pacific Marine Conservation
Council, Inc., Plaintiffs–Appellees,
Makah Indian Tribe, Intervenor–Appellee,
Gary Locke, Secretary of Commerce; National
Marine Fisheries Service; National Oceanic and
Atmospheric Administration, Defendants–Appellees.
Natural Resources Defense Council, Inc.; Pacific Marine
Conservation Council, Inc., Plaintiffs–Appellees,
Makah Indian Tribe, Intervenor–Appellee,
v.
Gary Locke, Secretary of Commerce; National
Marine Fisheries Service; National Oceanic and
Atmospheric Administration, Defendants–Appellees.

Nos. 09–16245, 09–16796
|
Argued and Submitted June 14, 2010.
|
Filed July 6, 2011.

**Synopsis**
**Background:** Environmental organizations brought action to challenge program of National Marine Fisheries Service (NMFS) seeking to preserve groundfish species off California, Oregon, and Washington coasts and NMFS's specifications. Association representing seafood processors in all three states moved to intervene as defendant. The United States District Court for the Northern District of California, James Larson, United States Magistrate Judge, dismissed motion as untimely. Association appealed.

**Holdings:** The Court of Appeals, Tashima, Circuit Judge, held that:

appeal was rendered moot when district court entered order of remedy and final judgment pending association's appeal, and

appeal did not fall within capable of repetition, yet evading review exception to mootness.

Appeal dismissed.

Bea, Circuit Judge, dissented and filed opinion.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

**Attorneys and Law Firms**

**\*702** Gwen L. Fanger, Davis Wright Tremaine LLP, San Francisco, CA, for applicant-in-intervention-appellant.

Selena K. Kyle, Natural Resources Defense Council, San Francisco, CA, for plaintiffs-appellees.

Appeals from the United States District Court for the Northern District of California, James Larson, Magistrate Judge, Presiding. DC No. 3:01 cv–0421 JL.

Before: DIARMUID F. O'SCANNLAIN, A. WALLACE TASHIMA, and CARLOS T. BEA, Circuit Judges.

Opinion by Judge TASHIMA; Dissent by Judge BEA.

**OPINION**

TASHIMA, Circuit Judge:

West Coast Seafood Processors Association ("WCSPA") appeals from the district court's denial of its motion to intervene as **\*703** a defendant in this case, in which the Natural Resources Defense Council, Inc., and Pacific Marine Conservation Council, Inc. (together, "NRDC") challenged the National Marine Fisheries Service's ("NMFS") program to preserve groundfish species off the coast of California, Oregon, and Washington. Because the litigation between NRDC and NMFS has ended, we dismiss WCSPA's appeal as moot.

**I.**

Exercising its authority under the Magnuson–Stevens Act, 16 U.S.C. § 1801 et. seq., NMFS uses two primary and interrelated tools to regulate Pacific groundfish fisheries: (1) the Pacific Coast Groundfish Fishery Management Plan ("Groundfish Plan"), established in 1982 and amended periodically since, which sets forth procedures for assessing the health of groundfish

populations and for formulating preservation measures; and (2) annual or biennial "specifications and management measures" ("Specifications"), which set quotas on the catch for each overfished species and impose restrictions on the methods used to catch such species.

## II.

This case was already eight years old when WCSPA sought to intervene, both as of right and permissively, but in one sense the case was brand new. NRDC originally filed the case as a challenge to Amendment 12 of the Groundfish Plan, which governs the development of rebuilding plans for overfished species. WCSPA began to participate as an amicus in late 2002, but it did not move to intervene. Between 2004 and 2007, NRDC amended its complaint four times, each time to add a challenge to a new amendment to the Groundfish Plan. WCSPA moved to intervene in anticipation of the Fourth Amended Complaint, but the presiding Magistrate Judge denied the motion as untimely, and WCSPA did not appeal.

In 2009, NRDC changed the nature of the case by filing a Fifth Amended Complaint that added a challenge to NMFS' 2009–10 Specifications. Whereas previously the case had concerned only the Groundfish Plan, the Fifth Amended Complaint brought in an attack on NMFS' other major regulatory mechanism, the Specifications that set fishing quotas. [1] In the past, NRDC had challenged the Specifications in separate actions. Between 2002 and 2005, it filed separate actions challenging the annual Specifications for 2002, 2003, and 2004, and the biennial Specifications for 2005–06. WCSPA successfully intervened in all four actions, thereby demonstrating a strong interest in fully participating in litigation concerning the Specifications. Predictably, WCSPA also moved to intervene in this case two days after NRDC filed its challenge to the 2009–10 Specifications in its Fifth Amended Complaint. But the Magistrate Judge [2] denied the motion as untimely because of the age of the litigation. On appeal, WCSPA argues that the Magistrate Judge erred by basing his decision on the age of the litigation (eight years) rather than the time that had elapsed between the filing of **\*704** the Fifth Amended Complaint and the motion to intervene (two days).

While this appeal was pending, however, the underlying litigation—the dispute between NRDC and NMFS—fully ran its course. On the parties' cross-motions for summary judgment, the Magistrate Judge held that the Specifications

for three species violated the Magnuson–Stevens Act, but that the Specifications for four other species did not. In an Order on Remedy, filed April 29, 2010—six weeks before we heard oral argument on this appeal—the Magistrate Judge directed NMFS to establish new Specifications within one year and retained jurisdiction to ensure the agency's compliance. Although NMFS filed a notice of appeal from the Order on Remedy, it voluntarily dismissed that appeal before briefing by either party. The Magistrate Judge entered final judgment on May 5, 2011.

## III.

An appeal is moot if there exists no " 'present controversy as to which effective relief can be granted.' " *Outdoor Media Group, Inc. v. City of Beaumont,* 506 F.3d 895, 900 (9th Cir.2007) (quoting *Vill. of Gambell v. Babbitt,* 999 F.2d 403, 406 (9th Cir.1993)). WCSPA appeals from the denial of its motion to intervene in a case that the district court has since decided, through the Order on Remedy and the subsequent final judgment, from which neither party has appealed. Because the underlying litigation is over, we cannot grant WCSPA any "effective relief" by allowing it to intervene now. The appeal is therefore moot. *See United States v. Ford,* 650 F.2d 1141, 1143 (9th Cir.1981) (dismissing as moot an appeal of a denial of a motion to intervene where the underlying litigation was voluntarily dismissed) ("Since there is no longer any action in which appellants can intervene, judicial consideration of the [intervention] question would be fruitless."); *cf. Canatella v. California,* 404 F.3d 1106, 1109 n. 1 (9th Cir.2005) (holding that entry of judgment in the underlying litigation does not moot an appeal from a denial of a motion to intervene, if one of the parties keeps the underlying litigation live by pursuing an appeal).

The "capable of repetition, yet evading review" exception to mootness does not apply. That exception applies only in "extraordinary cases." *Doe v. Madison Sch. Dist. No. 321,* 177 F.3d 789, 798 (9th Cir.1999) (en banc). Although it might apply to an appeal of the underlying litigation about the biennial Specifications, it does not apply to WCSPA's appeal of the denial of its motion to intervene.

First, the "capable of repetition" prong of the exception requires a "reasonable expectation" that the same party will confront the same controversy again. *Feldman v. Bomar,* 518 F.3d 637, 644 (9th Cir.2008). On this appeal, the controversy is whether WCSPA's motion to intervene was

2011 A.M.C. 2705, 11 Cal. Daily Op. Serv. 8363, 2011 Daily Journal D.A.R. 10,041

timely. Unique circumstances produced this controversy. For eight years, NRDC maintained an action challenging amendments to the Groundfish Plan, a subject that did not prompt WCSPA to intervene, at least not for the first six years of the case. NRDC then amended its complaint to add an attack on the 2009–10 Specifications, a subject that WCSPA did consider intervention-worthy. The district court denied the motion to intervene as untimely because of the age of the litigation. WCSPA disagrees and argues that the motion came in timely response to the Fifth Amended Complaint. It is not reasonable to expect that this dispute about timeliness will arise again. The hybrid Groundfish Plan/Specifications litigation is over. Although NRDC will likely challenge future Specifications and WCSPA will likely file future motions to **\*705** intervene, the timeliness issue, which is the subject of this appeal, will not likely reappear (as it did not appear in any of the other cases in which the NRDC challenged earlier Specifications and in which WCSPA successfully intervened), unless the same unlikely, hybrid scenario develops again over the next decade. Such a speculative possibility does not constitute a "reasonable expectation." *See Sze v. INS,* 153 F.3d 1005, 1009 (9th Cir.1998); *Luckie v. EPA,* 752 F.2d 454, 458 (9th Cir.1985).

Second, the intervention issue does not "evade review." A controversy evades review only if it is " 'inherently limited in duration such that it is likely always to become moot before federal court litigation is completed.' " *Ctr. for Biological Diversity v. Lohn,* 511 F.3d 960, 965 (9th Cir.2007) (quoting *Native Vill. of Noatak v. Blatchford,* 38 F.3d 1505, 1509 (9th Cir.1994)). With respect to this inquiry, one must not conflate the issue in the underlying litigation—whether the 2009–10 Specifications are valid—with the controversy in this appeal over WCSPA's motion to intervene. The controversy over the 2009–10 Specifications does evade review, because the Specifications are biennial. *See Alaska Ctr. for the Env't v. U.S. Forest Serv.,* 189 F.3d 851, 855 (9th Cir.1999) (two-year permit evades review); *see also Evans,* 316 F.3d at 911 (one-year NMFS specifications "evade review"). But the mootness *vel non* of the controversy over WCSPA's right to intervene depends on the duration of the underlying litigation, not on the duration of the Specifications. *See Canatella,* 404 F.3d at 1109 n. 1. Therefore, the intervention controversy does not evade review because, by virtue of the very fact that the underlying dispute satisfies the mootness exception and could continue well past the two-year Specifications period, the intervention dispute is not "inherently limited in duration" nor "likely always to become moot." *Lohn,* 511 F.3d at 965. Had NMFS not voluntarily dismissed its appeal, the underlying

case would have remained alive, and we could have granted WCSPA effective relief by allowing it to intervene. *See Canatella,* 404 F.3d at 1109 n. 1. The intervention controversy avoids review here only because NMFS acquiesced in the court-ordered remedy by dismissing its appeal, not because the controversy is "inherently limited in duration." Therefore, the exception does not apply. *See Lohn,* 511 F.3d at 965. [3]

## IV.

In sum, these appeals are moot and no exception to mootness can revive them. Accordingly, these appeals are

## DISMISSED.

BEA, Circuit Judge, dissenting:

The majority concludes that the case is moot and does not reach its merits. I respectfully dissent since I conclude the **\*706** case survives mootness because it falls in the "capable of repetition, yet evading review" exception to mootness. I would thus reach the merits of the appeal and reverse.

A seafood processors' trade association moved to intervene in a pending action, as of right and also permissively, two days after the magistrate judge had granted the plaintiff, an environmental organization, leave to file an amended complaint that challenged agency-set fishing quotas. For the past several years, the environmental organization had challenged such fishing quotas in separate federal court actions and the trade association had intervened in almost all of those actions. Here, however, the magistrate judge denied the trade association's motion to intervene on the sole ground the motion was untimely.

The proposed intervenor in this case is West Coast Seafood Processors Association ("WCSPA"), a nonprofit trade association whose member companies, located in California, Oregon, and Washington, process fish taken from fisheries into consumable fish products. WCSPA appeals the magistrate judge's denial of its motion to intervene in this case brought by the Natural Resources Defense Council, Inc., and Pacific Marine Conservation Council, Inc. (together the "NRDC"), self-styled environmental organizations, against the Secretary of Commerce, the National Oceanic and Atmospheric Administration, and the National Marine Fisheries Service ("NMFS").

In its Fifth Amended Complaint, NRDC alleges that NMFS violated the Magnuson–Stevens Fishery Conservation and Management Act ("Magnuson Act"), 16 U.S.C. § 1801 *et seq.,* which directs NMFS to end overfishing and to increase the populations of overfished species off the coasts of the United States. NMFS adopts fishery management plans to accomplish this statutory mandate. These plans set target dates by which to increase overfished populations to certain levels, as well as procedures to impose fishing limits to achieve those targets. Pursuant to those procedures, NMFS separately announces fishing limits that set quotas, in metric tons, on the amount of fish that may be caught each year.

In years past, NRDC has sued NMFS on the Pacific Coast Groundfish Fishery Management Plan ("Groundfish Plan") amendments, contending that the amendments violated the Magnuson Act. Between 2004 and 2007, NRDC amended its original complaint four times, each time to incorporate a challenge to a newly adopted Groundfish Plan amendment. WCSPA did not intervene in the suits as a party because it was satisfied with NMFS's representation as to issues raised relating to the Groundfish Plan.

However, in separate federal actions, NRDC also sued NMFS to challenge the annual fishing quota specifications for 2002, 2003, and 2004, as well as the biennial specifications for 2005–06, which dealt with quotas (metric tons of fish). WCSPA timely intervened in each case for each year (save one). Here, however, NRDC decided simply to amend its Groundfish Plan lawsuit by its Fifth Amended Complaint instead of following its longtime practice of bringing a separate and new lawsuit to challenge the 2009–10 specifications. Two days after the magistrate judge granted NRDC leave to so amend its complaint, WCSPA moved to intervene, as it had done in each of NRDC's separate, prior federal actions challenging fishing quotas since 2002. The magistrate judge here denied WCSPA's motion as untimely, and WCSPA appealed.

Given that NRDC fundamentally altered WCSPA's interest in this case when NRDC amended its complaint to challenge the 2009–10 fishing quotas, as opposed to **\*707** another amendment to NMFS's fishery management plan, and given that WCSPA promptly moved to intervene after the magistrate judge granted NRDC leave to file the amended complaint, I find the magistrate judge below abused his discretion by such denial; hence, I would reverse.

## I.

I disagree with the majority that the panel cannot reach the merits of the appeal because it is moot. Mootness is determined by whether a present controversy exists as to which a court can grant any effective relief. *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.,* 565 F.3d 545, 559 (9th Cir.2009). I agree with the majority that because the subject of the controversy that once existed between the NRDC and NMFS—the 2009–10 specifications—has expired and is on the verge of being replaced by a new set of specifications, there is no longer any effective relief this court can grant to WCSPA.

Nonetheless, I conclude that this case falls within the "capable of repetition, yet evading review" exception to mootness. This exception applies if two requirements are met: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again." *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (per curiam). The present case meets both of these requirements.

First, the challenged action here is too short in its duration to be fully litigated before a Court of Appeals and the Supreme Court prior to its expiration. The underlying lawsuit between NRDC and NMFS deals with fishing quota specifications which expire every two years. Once the fishing quota specifications expire, the controversy over WCSPA's right to intervene in the suit challenging the fishing quota specifications becomes moot. WCSPA thus has at most two years to challenge the denial of its motion to intervene before its challenge becomes moot. Both the Supreme Court and this court have held that two years is too short in duration for a case to be fully litigated. *S. Pac. Terminal Co. v. ICC,* 219 U.S. 498, 514–16, 31 S.Ct. 279, 55 L.Ed. 310 (1911) (order that expires by its terms after two years evades review); *Alaska Ctr. for Env't v. U.S. Forest Serv.,* 189 F.3d 851, 855 (9th Cir.1999) (a permit that expired in two years is too short for judicial review); *see also Greenpeace Action v. Franklin,* 14 F.3d 1324, 1329–30 (9th Cir.1992) (fishing quota specifications that expire in one year evade review).

Second, the challenged action is capable of repetition. The Supreme Court has explained that it is enough that the litigant "faces some likelihood of becoming involved in the same controversy in the future." *U.S. Parole Comm'n v. Geraghty,*

445 U.S. 388, 398, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). The central consideration is *whether the controversy* [is] *capable* of repetition and not ... whether the claimant ha[s] demonstrated that a recurrence of the dispute [is] more probable than not." *Honig v. Doe*, 484 U.S. 305, 318 n. 6, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (emphasis in original). Further, "[i]n estimating the likelihood of an event's occurring in the future, a natural starting point is how often it has occurred in the past." *Clarke v. United States*, 915 F.2d 699, 704 (D.C.Cir.1990) (en banc). For almost a decade before its Fifth Amended Complaint, NRDC had, without exception, challenged fishing quotas in separate actions, and WCSPA had, with only one early exception, intervened in each of those **\*708** actions. In the present case, WCSPA attempted to intervene in the fishing quota suit only two days after NRDC successfully amended its separate Groundfish Plan lawsuit to challenge the 2009–10 fishing quota specifications. Yet, the magistrate judge inexplicably concluded that WCSPA's motion to intervene was untimely despite WCSPA's promptness in filing its motion. Given that NRDC successfully prevented WCSPA from intervening in its fishing quota suit, it is now likely that NRDC will pursue its fishing quota challenges by amendment to future Groundfish Plan suits against NMFS rather than by separate action. Hence, WCSPA faces some likelihood of becoming involved in the same controversy in the future.

Because both prongs of the repetition and evasion exception are satisfied, I conclude this case falls within the "capable of repetition, yet evading review" exception to mootness. Therefore, I would reach the merits of WCSPA's appeal.

## II.

On the merits, I would hold that the magistrate judge abused his discretion when he denied WCSPA's motion to intervene as untimely. Under *United States v. Hinkson*, 585 F.3d 1247, 1251, 1262 (9th Cir.2009) (en banc), a trial court abuses its discretion if it fails to apply the correct legal standard to decide an issue. If, however, the trial court applies the correct legal standard, there is no abuse of discretion unless the trial court's findings of fact, and its application of those findings of fact to the correct legal standard, are illogical, implausible, or without support in inferences that may be drawn from facts in the record. *Id.*

Here, the magistrate judge correctly identified the three factors that courts weigh to determine whether a motion to intervene is timely: "(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *League of United Latin Am. Citizens v. Wilson* ("*LULAC* "), 131 F.3d 1297, 1302 (9th Cir.1997). But the magistrate judge abused his discretion because his findings as to those three factors are without support in inferences that may be drawn from facts in the record, as set out below.

## A. Stage of the proceedings

To determine whether the "stage of the proceeding" factor supports a finding of untimeliness, the court should consider not only "what had *not* yet occurred" prior to the motion to intervene, but also "what *had* already occurred by that time." *See LULAC*, 131 F.3d at 1303 (emphases in original). This factor weighs heavily against allowing intervention as of right where the trial court has substantially engaged the issues in a case. *Smith v. Marsh*, 194 F.3d 1045, 1051 (9th Cir.1999). But the mere lapse of time, without more, is not necessarily a bar to intervention; "changed circumstance" may "suggest[ ] that the litigation is entering a new stage" and, therefore, "militate in favor of granting the application." *United States v. Oregon*, 745 F.2d 550, 552 (9th Cir.1984).

The magistrate judge found that this factor weighed against timeliness in this case, but the reasons he cited for this finding are without support in inferences that may be drawn from facts in the record. The magistrate judge first noted that two related cases that challenged the 2001 and 2002 specifications, respectively, had been resolved on appeal. But this says little, if anything, about the stage of the proceedings in *this* case which dealt with fish quotas for 2009–10, not 2001 and 2002. This is true even as to the 2001 specifications case, which was consolidated with **\*709** this case and then dismissed. The 2002 specifications case has an even more tenuous connection to this case because that case was never consolidated with this one. Moreover, WCSPA timely intervened in the 2002 specifications case, but later moved to participate in this case only as an amicus. The only reasonable inference is that WCSPA perceived its interest to be stronger in challenges to the quotas in the specifications than in challenges to the procedural reforms of the Groundfish Plan amendments.

The magistrate judge also noted that, back in August 2001, he had granted summary judgment in this case to NRDC, in part because Amendment 12 violated the Magnuson Act's requirement that rebuilding plans take the form of a fishery

management plan, plan amendment, or proposed regulation. *NRDC v. Evans,* 168 F.Supp.2d 1149, 1158 (N.D.Cal.2001). But Amendment 12 is no longer at issue in this case because, by its own admission, "NRDC is no longer pursuing ... claims [as to] Amendments 12 and 16–1 through 16–3." Only Amendment 16–4, which supersedes the prior amendments, is still at issue in this case. Summary judgment as to Amendment 12 therefore does not support the magistrate judge's finding that this case is at a late stage in the proceedings. *Cf. United States v. Alisal Water Corp.,* 370 F.3d 915, 921 (9th Cir.2004) (motion that was pending as to the "bulk" of ongoing claims supported a finding that the motion to intervene came at a late stage in the litigation).

What the magistrate judge did not consider is that the filing of the Fifth Amended Complaint started the clock running as to the substance of that Amendment; the stage of the proceeding was now the initial stage of the proceeding with respect of NRDC's challenge to the 2009–10 specifications. The Fifth Amended Complaint challenged specifications for the first time in *this* case as to the 2009–10 specifications and quotas, rather than in a separate action as NRDC has done before without exception. Indeed, because NRDC did not file a separate action to challenge the 2009–10 specifications, the Fifth Amended Complaint challenged those specifications for the first time ever, in this case or any other. The magistrate judge therefore had not engaged—much less substantially engaged—the 2009–10 specifications in any prior proceeding in this case. At the time WCSPA moved to intervene, this case was not "at issue;" NMFS had not even filed a responsive pleading to the Fifth Amended Complaint. *See LULAC,* 131 F.3d at 1303 (holding the stage of the proceedings supported a finding of untimeliness of the proposed intervention where the defendant had filed an answer). Thus, this case entered a new stage with the filing of the Fifth Amended Complaint.

Here, I find instructive our opinion in *Oregon,* where the State of Idaho moved to intervene as of right in litigation over the extent to which two other states could, consistent with the treaty rights of several Indian tribes, regulate fishing in a river that runs through all three states. 745 F.2d at 551. The district court, which five years earlier had approved a plan between the parties for managing fisheries in the river, denied Idaho's motion as untimely. *Id.* at 552. It did so even though the motion was filed soon after two Indian tribes had withdrawn from the fisheries management plan and the district court had ordered the parties to renegotiate the plan. *Id.* at 552. We reversed, largely because "the possibility of new and expanded negotiations" between the parties regarding a

modified fisheries management plan constituted a "changed circumstance" and suggested the litigation was entering a new stage. *Id.* Far from agreeing with the district court that the stage of **\*710** litigation disfavored intervention, we held that the changed circumstance essentially had reset the clock on the time for filing a motion to intervene, such that "the stage of the proceeding ... militate[d] in favor of granting" Idaho's motion to intervene. *See id.*

In this case, I would likewise hold that the filing of the Fifth Amended Complaint constituted a changed circumstance that reset the timeliness clock. Even if, prior to WCSPA's motion to intervene in this case, "a lot of water had already passed underneath [the] litigation bridge" as to Plan amendments, *LULAC,* 131 F.3d at 1303, no water had passed underneath that bridge as to the 2009–10 specifications. The 2001 specifications case, which had been consolidated with this case, was dismissed following our opinion in *NRDC,* 316 F.3d at 913; and none of the actions that challenged the 2002, 2003, 2004, and 2005–06 specifications/quotas were ever consolidated with this case. Significantly, WCSPA intervened as a full-fledged party in each of those actions. Thus, the magistrate judge's finding that WCSPA's motion to intervene came too late in the proceedings is without support in inferences that may be drawn from facts in the record.

## B. Prejudice to the parties

To determine whether intervention prejudices the other parties to a case, the court compares the harm from allowing intervention at a later stage of the proceedings with what would have occurred no matter when the applicant was allowed to intervene. *Day v. Apoliona,* 505 F.3d 963, 965 (9th Cir.2007) ( "[T]hat the [applicant] is filing its Motion now, rather than earlier in the proceedings, does not cause prejudice ... since the practical result of its intervention ... would have occurred whenever the state joined the proceedings."). That is, prejudice in this context is the harm that arises from late intervention as opposed to early intervention. *See, e.g., Cal. Dep't of Toxic Substances Control v. Commercial Realty Projects, Inc.,* 309 F.3d 1113, 1119 (9th Cir.2002) (agreeing with the district court's finding of prejudice where the parties had already reached a settlement agreement, because late intervention "would complicate the issues and upset the delicate balance achieved by" the parties' agreement). Without more, additional delay does not cause prejudice; "otherwise every intervention motion would be denied out of hand because it carried with it, almost [by]

Case: 22-55060, 06/08/2023, ID: 12732148, DktEntry: 96, Page 39 of 41

West Coast Seafood Processors Ass'n v. Natural Resources..., 643 F.3d 701 (2011)
2011 A.M.C. 2705, 11 Cal. Daily Op. Serv. 8363, 2011 Daily Journal D.A.R. 10,041

definition, the prospect of prolonging the litigation." *LULAC,* 131 F.3d at 1304.

Here, the magistrate judge found that WCSPA's intervention would cause prejudice to the parties in this case for two reasons. First, the magistrate judge stated that NRDC, as "a nonprofit organization fighting environmental battles on many fronts," would have to allocate additional resources to this case if WCSPA were allowed to intervene. Puzzlingly, the magistrate judge did not explain what additional resources NRDC would need to expend that would not have been expended had WCSPA intervened earlier in this case. Second, the magistrate judge stated that WCSPA may attempt to conduct discovery, file motions, and challenge pervious rulings, and thus *possibly* could unravel all the progress of over seven years of litigation.

First, I am unaware that prejudice determinations should be made differently as to "nonprofit organizations" than as to "for profit organizations."[1] This court does **\*711** not accord privileged status to nonprofit organizations based on some notion of their greater civic virtue when compared to for profit —and thereby taxpaying—organizations. Neither is prejudice to be judged by whether a party is "fighting environmental battles on many fronts" or fishing fish out of many fisheries. The lapidary lettering on the front of the Supreme Court reads: "Equal Justice Under Law," without an asterisked reference that self-styled environmental organizations are more "equal" than other parties because they are "fighting environmental battles"—often of their own choosing.

Second, nor is there any authority for the proposition that the reallocation of resources, without more, may constitute prejudice. If this court were to permit a finding of prejudice merely because a party would be forced to expend more resources to litigate a case, prejudice would exist in every case. *See id.* Thus, it was illogical for the magistrate judge to base his finding as to prejudice on these two reasons.

The notion that WCSPA's motion to intervene could unravel all the progress of the last seven years of litigation is also unpersuasive. Although the general rule is that "intervenors are permitted to litigate fully once admitted to a suit," *LULAC,* 131 F.3d at 1304, WCSPA denies that additional discovery is necessary and that it could challenge any prior rulings. But "neither [the magistrate judge's] speculation nor [WCSPA's] reassurance can be dispositive of the timeliness issue" with respect to prejudice. *See id.*

On the issue of prejudice, I find our decision in *LULAC* instructive. In *LULAC,* public interest groups and individual citizens sued in the Central District of California for declaratory and injunctive relief to bar California state officials from enforcing provisions of Proposition 187, which required, *inter alia,* that foreign citizens present in California without proper immigration status be denied social services, health care, and education benefits. *Id.* at 1300–01. After the district court granted partial summary judgment to the plaintiffs, a foundation that helped draft and sponsor Proposition 187 moved to intervene. *Id.* at 1301. The district court summarily denied the motion, *id.,* and this circuit affirmed on the ground the motion was untimely, *id.* at 1308. As to prejudice, we held:

> [I]n a case like this one, in which the proposed intervenor waited twenty-seven months before seeking to interject itself into the case, only to move the court for full-party participation at a time when the litigation was, by all accounts, beginning to wind itself down, we believe that the additional delay caused by the intervenor's presence is indeed relevant to the timeliness calculus, and counsels against granting [the proposed intervenor's] motion.

*Id.* at 1304. In this case, by contrast, WCSPA did not wait to intervene to test the propriety of the challenged 2009–10 specifications; it sought to intervene two days after the magistrate judge granted NRDC leave to file the Fifth Amended Complaint, which challenged those specifications for the first time ever, and obviously, the first time in this case. This was significant because, prior to the filing of the Fifth Amended Complaint, NRDC had consistently challenged earlier specifications in separate actions and, beginning in 2002, WCSPA had consistently intervened in those separate actions.

Moreover, there was some discussion at oral argument as to whether WCSPA would withhold consent to the magistrate judge's jurisdiction and therefore force a transfer to another judge who would need to familiarize himself with this case. This **\*712** possibility cannot support a finding of prejudice here. Not only is the point speculative, but it has "little to do

with timeliness." *Oregon,* 745 F.2d at 553. Nothing suggests this possibility is "materially different now than [it] would have been had [WCSPA] sought to intervene a decade or [so] ago." *See id.* I therefore find no inferences which can be drawn from the record for holding that WCSPA's intervention would prejudice the existing parties due to the passage of time.

**C. Reason for and length of delay**

The final factor that bears on the timeliness of a motion to intervene is the "length of and the reason for its delay." *LULAC,* 131 F.3d at 1304. To assess the timeliness of a motion to intervene, the crucial date is not the date the applicant learned of the case, but rather "the date that the applicant should have been aware its interests would no longer be protected adequately by the parties." *Id.* (internal quotation marks and brackets omitted). The applicant's failure adequately to explain the reason for its delay in moving to intervene may weigh even more heavily than the delay itself in finding the motion untimely. *See id.*

Here, the magistrate judge found that WCSPA waited over seven years from the time NRDC filed the original complaint in 2001, and over four years from the time we highlighted—in *NRDC v. National Marine Fisheries Service,* 421 F.3d 872, 878 (9th Cir.2005)—the economic impact of rebuilding plans on fishing communities, before WCSPA moved to intervene in response to the Fifth Amended Complaint. The magistrate judge also found that WCSPA gave no reason for its delay, but merely denied that there had been any delay. But WCSPA was correct to insist that it did not delay; WCSPA moved to intervene only two days after the magistrate judge granted NRDC leave to file the Fifth Amended Complaint.

As noted above, in the Fifth Amended Complaint NRDC raises new issues not mentioned in the previously operative complaint—it challenged the 2009–10 specifications, as opposed to mere Groundfish Plan amendments. In so doing, NRDC fundamentally altered WCSPA's interest in this case because by challenging the 2009–10 specification, NRDC challenged specific quotas on the amount of each overfished groundfish species that may be fished—and therefore processed—in 2009 and 2010. This bears far more heavily and directly on the ability of WCSPA's members to earn their livelihood processing fish than the Groundfish Plan amendment. These new issues triggered WCSPA's right to intervene. Whereas WCSPA had been content to participate in this case as an amicus, it consistently intervened in separate actions that challenged the specifications/quotas. The most reasonable inference from this pattern of litigation is that WCSPA concluded that NMFS could adequately protect WCSPA's interests as to Groundfish Plan amendments at issue in this case, but that NMFS could not adequately protect WCSPA's interests as to specifications at issue in the other actions.

Thus, WCSPA had no cause to intervene in this case until the filing of the Fifth Amended Complaint. Given the pattern of litigation set out above, in which NRDC challenged successive Groundfish Plan amendments in this case and annual/biennial specifications in separately filed actions, WCSPA had no reason to know that NRDC would one day challenge the 2009–10 specifications not by continuing its practice of commencing a separate action, but by amending its complaint in this case. WCSPA therefore had no reason to intervene in this case prior to the filing of the Fifth Amended Complaint. *See* **\*713** *Alisal,* 370 F.3d at 923 ("A party must intervene when he knows or has reason to know that his interests might be adversely affected by the outcome of litigation." (internal quotation marks omitted)); *cf. United States v. Washington,* 86 F.3d 1499, 1506 (9th Cir.1996) ("A failure to realize that one's interests are in jeopardy until very late in the proceedings may make a late motion to intervene 'timely.' ").

Accordingly, the magistrate judge's finding that WCSPA's motion to intervene in this case was long delayed, for no apparent reason, is without support in inferences that may be drawn from facts in the record. Thus, in light of all the factors that bear on timeliness, the magistrate judge abused his discretion when he denied WCSPA's motion to intervene as untimely.

**III.**

For the reasons set out above, I conclude that the case is capable of repetition and the magistrate judge erred when he denied WCSPA's motion to intervene as of right. I therefore respectfully dissent.

**All Citations**

643 F.3d 701, 2011 A.M.C. 2705, 11 Cal. Daily Op. Serv. 8363, 2011 Daily Journal D.A.R. 10,041

2011 A.M.C. 2705, 11 Cal. Daily Op. Serv. 8363, 2011 Daily Journal D.A.R. 10,041

## Footnotes

1    At its inception, this case was consolidated with a separate case that challenged the 2001 Specifications, but that separate case was dismissed after we resolved the challenge to the 2001 Specifications on appeal in 2003. *See Natural Res. Def. Council, Inc. v. Evans,* 316 F.3d 904 (9th Cir.2003).

2    All parties consented under 28 U.S.C. § 636(c)(1) to a Magistrate Judge entering judgment in the case.

3    The dissent contends that WCSPA "has at most two years to challenge the denial of its motion to intervene before its challenge becomes moot." Dissent at 707. This statement conflates the underlying litigation with WCSPA's appeal. Because the Specifications are biennial, under mootness principles NRDC would have but two years to challenge them. That is not enough time; therefore, the exception applies. *See Evans,* 316 F.3d at 911. And because the exception applies, the underlying litigation could endure longer than two years—indeed, had NMFS not voluntarily dismissed its appeal, the litigation would still be ongoing now, despite the expiration of the Specifications. Because a remedy existed on WCSPA's motion to intervene for as long as the underlying litigation endured, and because the duration of the underlying litigation had no inherent limit (as its ten-year life span attests), the intervention controversy does not "evade review" under our case law. *See Lohn,* 511 F.3d at 965.

1    Nor why this factor should be considered where the opponent WCSPA is itself also a nonprofit association.

---

**End of Document**                                                  © 2023 Thomson Reuters. No claim to original U.S. Government Works.